RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-5030

KELVIN MONDALE NEWSOM,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00035—Robert L. Echols, Chief District Judge.

Argued: March 15, 2006

Decided and Filed: June 29, 2006

Before: COLE, GILMAN, and FRIEDMAN, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Courtney D. Trombly, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Kelvin Mondale Newsom was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. He was sentenced to a term of 86 months of imprisonment, to be followed by three years of supervised release. In this appeal, he raises challenges to (1) the sufficiency of the evidence supporting his conviction, (2) the admission of evidence regarding his tattoos that depict firearms, (3) the jury instructions regarding his other acts not charged in the indictment, and (4) the constitutionality of his sentence under *Booker*. For the reasons set forth below, we **AFFIRM** Newsom's conviction, but **VACATE** his sentence and **REMAND** the case for resentencing pursuant to *Booker*.

_____

[*] The Honorable Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

1

# I. BACKGROUND

## A.    Newsom's arrest

On November 23, 2003, Newsom was driven to his mother's residence by a friend, Alexis Craig. Newsom arrived and joined some family members outside to talk. A few minutes later, Carlos Blacksmith pulled up in a sport utility vehicle (SUV), stepped out to talk to the family, and left the vehicle running. Newsom told Blacksmith that "he didn't have no business riding around like that with that truck dirty like that." Blacksmith agreed and asked Newsom to take the SUV and "detail it up" for him. Prior to this date, Newsom had on occasion detailed (meaning cleaned) cars for money, earning approximately $30 to $40 per car plus tips. Often this cleaning was accomplished by taking vehicles to a mobile detailing van, which contained all of the equipment necessary to perform the required tasks (water hoses, vacuums, etc.).

Newsom got into Blacksmith's SUV and left to take it to the mobile detailing van. He was not wearing his seatbelt, and he lit a marijuana cigarette while driving. After Newsom drove a few blocks, a police officer in a patrol car started following the SUV because Newsom had failed to stop at a stop sign and was not wearing his seat belt. While following Newsom, the officer noticed him "moving around inside the car" and anticipated that he was going to get out and flee on foot. The officer testified in further detail about Newsom's movement in the vehicle:

> I was looking through the back glass of the vehicle, and I could see the driver moving appeared [sic] to me as if he was maybe putting something under the seat. In the 12 years I have been a policemen [sic], several people have concealed things on me, and it is the same type of movement, a movement towards the front where the upper part of their body will disappear momentarily.

Eventually the officer pulled Newsom over and approached the SUV.

Newsom furnished someone else's photo identification upon the request of the officer. After the officer smelled the odor of burning marijuana and asked Newsom about it, Newsom replied that he was in fact smoking marijuana. Newsom gave the officer the remaining portion of the marijuana cigarette. After that, Newsom admitted to the officer that he had given him a false name at first because there was an outstanding warrant for Newsom's arrest stemming from a previous incident of driving without a license, and he knew that he was going to jail. The officer then asked Newsom to step out of the vehicle, handcuffed him, and put him in the back of the patrol car.

Upon returning to the vehicle, the officer immediately saw through the open door a pistol under the driver's seat. A full search of the vehicle revealed Newsom's wallet in the front seat, a magazine with 22 rounds of ammunition pushed between the driver's seat and the center console, and a single round of ammunition lying loose on the floorboard in front of the passenger's seat. The officer testified that he asked Newsom about the gun and that Newsom told him that "he had never touched the gun and didn't know it was there." But Newsom also said that the gun was not stolen. There were no fingerprints on the gun or ammunition.

In January of 2004, a federal warrant was issued for Newsom's arrest. He was apprehended by federal law enforcement agents the following month. While being transported to the federal building in downtown Nashville, Newsom asked the agents "what kind of time he was looking at for this charge." One of the federal officers said "that the maximum penalty was ten years but that there was [sic] a lot of variables that were taken into consideration to come up with his final sentence."

Those present gave differing accounts of Newsom's response to this information. One officer said that Newsom "stated that there was nothing he could do because he had that gun." The

other officer testified that Newsom replied with "a statement to the effect of, Well, there is nothing I can say. Ain't nothing I can say about that because I had that gun. I had the gun. I had that gun. Something along those lines." In contrast, Newsom testified that he had replied: "[S]ince y'all told me I can't get out on a bond and that I am facing up to ten years federal time, I told them I might as well say the gun is mine then. I told them I might as well say that the gun is mine. What chance do I have?" Newsom specifically denied making the statement "I had that gun."

## B.     Newsom's trial

### 1.          *Admission of evidence regarding Newsom's tattoos that depicted firearms*

Craig, the friend who drove Newsom to his mother's home, testified on direct examination that she had never seen Newsom with a gun. She also said that if she had thought that he had a gun when she went to pick him up on the day in question, she would not have let him get into the car. As cross-examination began, the government approached the bench and stated: "Your Honor, I am going to ask that we be able to go into the tattoos that the defendant has on his body. He has several tattoos on his body indicating possessing a firearm." Defense counsel responded by saying: "Judge, this is pretty far afield," and "Your Honor, this is awfully far afield . . . . This is just ridiculous."

The district court ruled that the fact that Newsom had tattoos depicting firearms "might go to attack [Craig's] credibility, but I don't think it shows that he had a firearm. He could still love firearms and not have one on this day in question." The court later reaffirmed that the government was permitted to ask Craig about the tattoos "to challenge her credibility that she had [not] seen him with a gun because he had guns tattooed on him."

After the bench conference concluded, the following exchange took place between the government's counsel and Craig:

> Q.     Are you aware that the defendant has tattoos?
> A.     Yes.
> Q.     With firearms on his body?

Defense counsel then objected that the question was leading, but the court overruled the objection. Craig answered that she did not know what kind of tattoos Newsom had.

After this exchange, defense counsel felt that he had "[no] choice but to broach the subject" of Newsom's tattoos, so he asked his later witnesses about the tattoos that they had seen on Newsom's body. Newsom's nephew, Eddie Readus, said that he remembered tattoos with the names of his mother and brother. Newsom's sister, Teresa Sanders, testified about a tattoo with the name of Newsom's father and another with his daughter's face. Defense counsel's goal was to show that Newsom's tattoos were "not really about guns."

But the government's cross-examination drew out the details of Newsom's other tattoos. For example, Readus was asked whether he was aware "that [Newsom] has a [tattoo of] a man holding a gun that says 'fuck y'all' on it," to which Readus replied "[n]o." More detail came out through the government's questions put to Sanders. The government questioned Sanders about the following other tattoos on Newsom's body:

- one "on [the] right side of his neck with a gun on it,"

- one "on the left side of his neck" that said "98 MMCG" (Although Sanders did not know what this tattoo meant, Newsom later explained that it meant "98 Main Street Mafia Crip Gang," and was placed there to honor a friend who was a victim of a gang murder.),

- one that said "something pretty ugly on his stomach,"

- one "on his upper chest that says 'feel my pain,'"

- one "on his right bicep . . [that] ha[s] the word 'mob,'"

- another "on his right forearm . . . [that] also ha[d] the word 'thug life,'" and

- one "on his left arm [with the words] 'live for and die for' around a bag of money."

During a discussion of whether to issue a jury instruction regarding the tattoos, the district court reiterated its position on the tattoo evidence:

> The Court still feels that [the] tattoos are not really relevant to the issue or issues in this case, and the Court admitted it initially to challenge the testimony of a witness and for that purpose only. But it was expanded not through rulings by the Court but by I guess the lawyers' efforts to correct that challenge or to meet the challenge or to explain them more fully.

### 2. *Jury instructions regarding Newsom's prior convictions, tattoos, and other acts*

The district court instructed the jury with respect to Newsom's prior convictions, tattoos, and other acts as follows:

*PRIOR CONVICTIONS*

You have heard that before this trial the defendant was convicted of prior crimes.

These earlier convictions were brought to your attention only as one way of helping you assess his credibility and decide how believable his testimony was. You cannot use the earlier convictions for any other purpose. It is not evidence and cannot be considered as evidence that he is guilty of the crime that he is on trial for now.

*OTHER ACTS OF DEFENDANT*

You have heard testimony that the defendant committed some acts other than the ones charged in the Indictment.

This evidence may not be considered to prove the character of the Defendant in order to show he committed the offense charged. You cannot consider this testimony as evidence that the defendant committed the offense for which he is on trial now. Instead, you can only consider it for other limited purposes, such as proof of motive, intent, identity, or absence of mistake. Do not consider such evidence for any other purpose.

You also have heard evidence that the Defendant has tatoos [sic] on his body. Evidence of these tatoos [sic] must not be considered by you in determining if the Defendant committed the offense charged in the Indictment. This evidence was admitted initially to challenge the credibility of a witness, not to prove that the Defendant is guilty of the charged offense.

Remember, the defendant is on trial here only for the specific offense alleged in the Indictment, not for any other acts. Do not return a guilty verdict unless the government proves the offense charged in the Indictment beyond a reasonable doubt.

Newsom did not object to any of the jury instructions.

## II. ANALYSIS

### A.     Admission of evidence of Newsom's tattoos

The jury was made aware of Newsom's tattoos depicting firearms and containing negative messages twice during the trial. This first occurred during the cross-examination of Craig, when the government asked her whether she knew about Newsom's tattoos that depicted firearms. Then, as two defense witnesses were examined and cross-examined, both sides asked about the details of Newsom's tattoos. These separate instances will be addressed in turn.

#### 1.     *Relevance of the government's cross-examination of Craig*

#### a.     *Whether the district court erred in allowing the cross-examination*

Defense counsel's objections during the bench conference that any questions to Craig regarding Newsom's tattoos were "pretty far afield" and "awfully far afield" squarely challenged the relevance of the evidence. Because a timely objection was made on the basis of relevance, we review the district court's ruling using the abuse-of-discretion standard. *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) ("The standard of review for the admission of evidence where relevance is at issue is abuse of discretion, which exists when the reviewing court is firmly convinced that a mistake has been made."). Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The government posited two theories of relevance to the district court in support of the request to ask Craig about Newsom's tattoos. It first argued that the firearm-related tattoos bore on the issue of whether Newsom possessed the gun found in the SUV, which is an element of the charged offense. Specifically, the government contended that Newsom "ha[d] several tattoos on his body indicating possessing a firearm," and that the tattoos "go[] to show that he has a liking towards firearms." The district court rejected this theory: ". . . I don't think it shows that he had a firearm. He could still love firearms and not have one on this day in question." The district court thus held that the fact that Newsom had tattoos depicting guns was not relevant to the issue of possession with regard to the charged offense.

As an alternative theory under which to ask Craig about Newsom's tattoos, the government argued that Craig's statement that she had never seen Newsom with a gun was "almost . . . saying that he doesn't go around firearms, and . . . that goes to impeach whether she knows whether or not he has tattoos with firearms on him." Although the logic of this statement leaves much to be desired, the district court accepted the argument, holding that the question could be put to Craig because "it might go to attack credibility." The court later explained its reasoning more fully, stating that the evidence was admitted "to challenge her credibility that she had [never] seen him with a gun

because he had guns tattooed on him." Thus the issue for us to resolve is whether Craig's potential response to the government's proposed line of questioning could have had "any tendency" to make Craig's testimony that she had never seen Newsom with a gun more or less credible. *See* Fed. R. Evid. 401.

We conclude that the district court abused its discretion when it allowed the government to ask Craig whether she had seen Newsom's firearm-related tattoos. Her answer to the government's question was simply not relevant to the question of her credibility. Whether Craig knew that Newsom had *pictures* of firearms tattooed on his body presents a completely different issue than whether Craig had ever seen Newsom possess an *actual* firearm. Even if Newsom had a pistol tattooed on his forehead and Craig admitted that she had seen it, that does not make Craig's testimony that she had never seen Newsom with a firearm more or less believable.

### b.      *Whether the district court's error was harmless*

Without any elaboration, the government argues that any error in allowing the question regarding Newsom's firearm-related tattoos was "clearly harmless given the factual circumstances of the case." The government is correct in stating that the harmless-error standard applies.

Despite our conclusion that the district court erred when it allowed the government to cross-examine Craig about Newsom's tattoos, we will reverse its judgment only if the error was "more than harmless." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004) ("This court reviews a district court's evidentiary rulings for abuse of discretion, and a district court's determination will be reversed only if the abuse of discretion caused more than harmless error."); *see also United States v. Baldwin*, 418 F.3d 575, 581 (6th Cir. 2005) ("Even where a district court erroneously admits evidence, we will not reverse the defendant's conviction if the error is deemed harmless."). The government bears the burden to prove that any error was harmless. *United States v. Olano*, 507 U.S. 725, 734 (1993) (stating that in the harmless-error inquiry under Rule 52(a) of the Federal Rules of Criminal Procedure, the government bears the burden of persuasion).

For the purposes of this appeal, "[a]n error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Baldwin*, 418 F.3d 582 (citation and quotation marks omitted); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Craig's single response that she was not aware of any tattoos on Newsom's body depicting firearms is so attenuated an exchange in the context of the overall trial that we can comfortably say that it "did not contribute to the verdict obtained." *Baldwin*, 418 F.3d at 582 (citation and quotation marks omitted).

### 2.      *Balancing the probative value versus the potential for unfair prejudice as to the government's cross-examinations about the details of Newsom's tattoos*

Newsom's next argument on appeal is that the district court erred in allowing the government to cross-examine his other witnesses regarding the details of Newsom's tattoos because the resulting evidence violated Rule 403 of the Federal Rules of Evidence. His trial counsel, however, did not lodge an objection under Rule 403 to these tattoo-related questions. We will therefore not reverse unless we find plain error. *United States v. Glover*, 21 F.3d 133, 136 (6th Cir. 1994) (reviewing Glover's claim under Rule 403 of the Federal Rules of Evidence for plain error because he failed to object to the admission of the testimony at trial); *see also* Fed. R. Crim. Proc. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought before the court's attention.").

This court has conceptualized the plain-error inquiry as a four-step process under Rule 52(b) of the Federal Rules of Criminal Procedure:

First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993) (interpreting the Supreme Court's decision in *Olano*, 507 U.S. 725); *see also United States v. Jones*, 108 F.3d 668, 670 (6th Cir. 1997) (en banc) (following *Thomas*'s division of the plain-error inquiry into "four distinct, though interrelated, analyses").

### a.     Whether the district court erred in allowing the government to cross-examine Newsom's witnesses regarding the content of his various tattoos

Rule 403 of the Federal Rules of Evidence allows the district court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (citation and quotation marks omitted).

The discretion granted to the district court in analyzing evidence under Rule 403 is "very broad." *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989). "Our review of a Rule 403 ruling is limited in that we must look at the evidence in 'the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *Bonds,* 12 F.3d at 567 (citation omitted).

The district court allowed the prosecution to question Newsom's witnesses in great detail about the contents of Newsom's tattoos. This was done without objection by defense counsel, presumably because counsel had explored the subject by his own questioning of Newsom's witnesses on direct examination. Through this questioning, the jury learned of Newsom's various tattoos, including ones of a firearm-wielding individual with the associated phrase "fuck y'all," a gang reference, and other subjects that indicated he lived a "thug life" (one tattoo actually said "thug life," while another had the words "live for and die for" surrounding a bag of money).

The details of Newsom's tattoos were simply not probative regarding the sole issue in this case—whether Newsom possessed the firearm found under the driver's seat of the SUV on November 23, 2003. Simply put, the fact that Newsom had a tattoo of a gun-wielding man or the words "thug life" on his arm did not make it any more likely that he possessed the particular gun charged in the indictment on the day in question. The district court agreed, ruling that the content of the tattoos were not relevant. ("The Court still feels that [the] tattoos are not really relevant to the issue or issues in this case . . . ."). Evidence that is deemed irrelevant is necessarily not probative of any issues in the case. Thus, even maximizing the probative value of the tattoo evidence, *see Bonds,* 12 F.3d at 567, we are left with nothing.

On the other side of the balancing equation is the evaluation of the unfair prejudice that resulted from the admission of the evidence. The tattoo evidence was unfairly prejudicial because it suggested to the jury that Newsom had a hostile, criminal disposition, and a conviction on that basis is obviously improper. *See Bonds*, 12 F.3d at 567 (defining "unfair prejudice" as evidence suggesting a decision made on an improper basis). Because there was no legitimate probative force of the evidence concerning the details of Newsom's tattoos, the prejudice to Newsom was "unfair,"

as opposed to being the "damage to a defendant's case that results from the legitimate probative force of the evidence." *See id.*

Even taking into account the high standard of review for district court rulings under Rule 403, *see Vance*, 871 F.2d at 576; *Bonds,* 12 F.3d at 567, we conclude that the probative value of the tattoo evidence, if any, was substantially outweighed by the danger of unfair prejudice to Newsom. The district court therefore erred in allowing the government to introduce this evidence.

### b.        *Whether the district court's error was plain*

Under the second step of the plain-error analysis, we must determine whether the error was "plain." *Thomas*, 11 F.3d at 630. In order to be "plain," an error must be "clear" or "obvious." *Id.* The district court stated on the record that the tattoo evidence was not relevant to the issue of possession (and thus had no probative value). In light of this conclusion, the district court's error admitting the evidence was obvious—obvious even to the district court. The court attempted to diminish its responsibility for the error by saying that the scope of tattoo evidence put before the jury "was expanded not through rulings of the Court but by I guess the lawyers' efforts to . . . meet the challenge" to Craig's credibility, but such an explanation does not make the error any less plain.

### c.        *Whether the district court's plain error affected Newsom's substantial rights*

In deciding whether the error affected Newsom's substantial rights, the inquiry is whether the error "affected the outcome of the district court proceedings." *United States v. Cotton*, 535 U.S. 625, 632 (2002) (citation omitted). The burden to show that the error affected the outcome of the proceedings rests with Newsom. *See Olano*, 507 U.S. at 734 (stating that the defendant bears the burden of persuasion to demonstrate prejudice in the plain-error inquiry under Rule 52(b)). In some cases, the admission of evidence that should have been excluded has been found to have changed the outcome of the proceedings. *See, e.g., United States v. Buchanon*, 72 F.3d 1217, 1227 (6th Cir. 1995) (holding that the district court committed plain error by admitting evidence obtained in violation of the Fourth Amendment where the error "did affect a substantial right of the defendants and the admission of evidence which should have been excluded did have a prejudicial impact on the jury.").

The district court in the present case, however, gave a jury instruction specifically relating to the tattoo evidence, stating that "[e]vidence of the[] tatoos [sic] must not be considered by you in determining if the Defendant committed the offense charged in the Indictment."   We will presume that the jury followed this instruction, *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001) ("We have often stated our presumption that jurors follow their instructions.") (citing several cases), unless we conclude that the evidence that was admitted was so prejudicial that Newsom was deprived of a fair trial. *United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002) ("The presumption is overcome only where evidence has been admitted that is so prejudicial that, even with a limiting instruction, the defendant's right to a fair trial is compromised."). Although we conclude that the tattoo evidence was improperly admitted (see Part II.A.2.a., above), the degree of prejudice to Newsom did not rise to such a level that he was deprived of a fair trial. We are thus of the opinion that the district court's error in admitting the evidence did not affect the ultimate verdict.

Newsom has therefore failed to satisfy the third step of this court's plain-error review, making reversal on this ground unwarranted.

**B.      Instructions to the jury regarding the Newsom's prior convictions, tattoos, and other acts not charged in the indictment**

Newsom did not object to any of the jury instructions given by the district court. As such, we will not reverse his conviction on the basis of the instructions except upon a finding of plain error. *See United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992) ("Where a defendant fails to object to the jury instructions at trial, we review for plain error only."); *see also* Fed. R. Crim. P. 30(d) ("Failure to object [to the jury instructions] in accordance with this rule precludes appellate review, except [for plain error] under Rule 52(b).") In the context of challenges to jury instructions, "[p]lain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Combs*, 33 F.3d 667, 669 (6th Cir. 1994) (citation and quotation marks omitted).

Newsom challenges the district court's jury instructions in two ways: (1) by claiming error in that the instruction gave a "laundry list" of potential uses for the objectionable evidence that were not explained to the jury and were not applicable in this case, and (2) by alleging that the jury instruction pursuant to Rule 404(b) of the Federal Rules of Evidence, which came directly after the instruction regarding Newsom's past convictions, confused the jury into believing that it could consider his past convictions for the purposes enumerated in the Rule 404(b) instruction. These challenges will be addressed in turn.

### *1.      Newsom's laundry-list-of-unexplained-and-inapplicable-uses argument*

Pursuant to Rule 404(b) of the Federal Rules of Evidence, the district court instructed the jury that it could consider acts of Newsom other than those charged in the indictment "for other limited purposes, such as proof of motive, intent, identity, or absence of mistake." No explanation was given as to what other acts of Newsom the instruction was referring to, nor did the instruction inform the jury as to why those uses of the evidence were relevant to the issues in this case. The crux of Newsom's argument is that this lack of explanation and listing of uses that were not relevant constituted error on the part of the district court.

In *United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996), this court explained that in order to introduce evidence under Rule 404(b), "the government's purpose . . . must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." After such a legitimate purpose has been identified, then "the district court must determine whether the identified purpose, whether to prove *motive* or *intent* or *identity* [or] some other purpose, is 'material'; that is, whether it is 'in issue' in the case." *Id*. at 1076-77 (emphases in original).

Once the evidence is admitted, the jury must then be properly instructed on the uses for which the evidence was offered. This court in *United States v. Johnson*, 27 F.3d 1186 (6th Cir. 1994), warned the district courts regarding the importance of careful jury instructions for Rule 404(b) evidence:

> To apply Rule 404(b) fairly, the district court must carefully identify, in its instructions to the jury, the *specific factor* named in the rule that is relied upon to justify admission of the other acts evidence, explain why that factor is *material*, and warn the jurors against using the evidence to draw the inferences expressly forbidden in the first sentence of Rule 404(b).

*Id*. at 1194 (emphases added). The specific points listed in the jury instruction for which the evidence can be considered must therefore be "material" or "at issue" in the case.

Two of the four permissible uses listed in the district court's instruction were patently irrelevant. Newsom never defended against the gun-possession charge by putting his motive at issue or by saying that he was not the alleged perpetrator (i.e., challenging the issue of identity). Rather, his only defense was that the gun was not his and that he did not know that it was under his seat. Furthermore, Newsom never claimed that he made a mistake. This is not a case, for example, where the defendant thought that he was carrying a toy gun, but was actually mistaken because the gun was in fact real. The district court therefore improperly included in its jury instructions the use of Newsom's other acts as "proof of motive, . . . identity, [and] absence of mistake."

As for the permissible use of "intent," however, the instruction was proper. The charge of being a felon in possession of a firearm generally does not require proof of intent. *See United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996) ("Defendant's intent was also not in issue because the gun possession charge does not require proof of specific intent."). But the particular theory upon which the government bases its case against Newsom—that of constructive possession—does require specific intent. *See United States v. Hadley*, 431 F.3d 484, 507 (6th Cir. 2005) (holding that constructive possession exists where one "knowingly has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others.") (citation and quotation marks omitted) (emphasis added). Because the government was required to prove Newsom's intent to exercise control over the gun in order to prove constructive possession, the issue of his intent was "material" for the purpose of a Rule 404(b) instruction. *See Merriweather*, 78 F.3d at 1076 (holding that a fact "that the statutory elements obligate the government to prove" is considered to be "material").

In sum, three of the four permissible uses for uncharged conduct that were enumerated by the district court in its jury instructions were not at issue in this case. One use listed by the jury instructions was actually at issue, however, compelling the conclusion that the district court did not commit plain error. *See United States v. Stevens*, 303 F.3d 711, 716 (6th Cir. 2002) ("Where a single, legitimate purpose supports the admission of the evidence under Rule 404(b), a trial court's admission of that evidence for additional reasons allowed under the rule does not constitute plain error."); *see also United States v. Garcia-Meza*, 403 F.3d 364, 369 n.1 (6th Cir. 2005) (concluding that the district court did not commit plain error by including in its Rule 404(b) jury instruction "all [of] the proper purposes for which the evidence could be admissible under Rule 404(b)" because the evidence "was certainly admissible to show motive") (*citing Stevens*, 303 F.3d at 716).

Although Newsom's intent was at issue in this case due to the constructive-possession theory argued by the government, the jury was not properly informed that it had to decide the issue. The district court's instruction on constructive possession entirely omitted the matter of intent:

> [A] person need not have actual physical custody of an object in order to be in legal possession of it. If an individual has the ability to exercise substantial control over an object that he does not have in his physical custody, either directly or through another person, then he is in possession of that item even though he may not have actual physical custody of the object.

*Compare Hadley*, 431 F.3d at 507 (requiring for purposes of establishing constructive possession that the defendant had the "intention" to exercise control over the object). But to the extent that this omission constituted error, Newsom waived any challenge by failing to object to the jury instruction and failing to even raise the issue on appeal. *United States v. Still*, 102 F.3d 118, 122 n. 7 (5th Cir.1996) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.") (citation and quotation marks omitted). We therefore conclude that the error in the district court's jury instructions does not satisfy the plain-error standard and that reversal on this ground is unwarranted.

That being said, we pause to comment on the tension between existing Sixth Circuit opinions regarding Rule 404(b) jury instructions. On the one hand, this court warns the district courts about how carefully they must instruct juries regarding Rule 404(b) evidence. *See, e.g., Johnson*, 27 F.3d at 1194 (requiring courts to identify specific uses for the evidence that are actually implicated in the case). But this court has held in other cases that, so long as the district court includes in its instructions at least *one* permissible use, reversal is not warranted, at least where the plain-error standard of review applies. *See, e.g., Garcia-Meza*, 403 F.3d at 369 (finding no plain error because the list of permissible uses provided by the district court's jury instructions included one relevant use).

So long as cases like *Stevens* and *Garcia-Meza* continue to embody the law of this circuit, the district courts will have little incentive to heed the warnings that this court gave in *Johnson* where defense counsel fails to object to the overbroad instruction. The district courts might attempt to protect their judgments from reversal under such circumstances simply by including the entire list from Rule 404(b), hoping that this scattershot approach will hit the mark with at least one relevant use for the evidence. A resolution of this tension, however, is beyond the power of the present panel. *See Salmi v. Sec. of Health and Human Serv.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

## 2.     *Newsom's juror-confusion argument*

Because Newsom testified in this case, the district court admitted evidence of his prior convictions to impeach his credibility as a witness. The district court accordingly instructed the jury that such evidence was not to be considered on the matter of Newsom's guilt, but only as to his credibility as a witness. It then went on to deliver instructions regarding the use of evidence regarding Newsom's "acts other than the ones charged in the Indictment," telling the jury that it could consider such evidence for the various purposes discussed above. Newsom argues that by presenting these instructions back to back, the district court confused the jury as to how it could use the prior-convictions evidence. This is because the jury might have believed the reference to Newsom's commission of "some acts other than the ones charged in the Indictment" included his prior convictions.

In this case, the district court discussed at length with counsel for both parties the proposed jury instructions relating to Newsom's prior convictions, tattoos, and other acts. The court specifically stated that it was not going to enumerate the particular other acts to which the Rule 404(b) instruction referred. According to the court, these other acts included the presentation of a false identification to the arresting officer, prior gambling, driving on a revoked license, and "one or two other instances." But the court "did not with any detailed specificity refer to those instances . . . because [it] didn't want to highlight them." Newsom's counsel did not object to either the ruling or the reasoning of the district court.

On appeal, Newsom does not cite any authority for the proposition that a prior-convictions instruction presented back to back with a Rule 404(b) instruction could confuse the jury. Nor has he presented any basis to believe that the jurors merged the two instructions to allow them to consider Newsom's prior convictions as to the issues of "motive, intent, identity, or absence of mistake." We therefore conclude that these instructions were not confusing, and thus that the district court did not err when it instructed the jury as to the "acts other than the ones charged in the Indictment."

Based upon the foregoing, we conclude "that, taken as a whole, the jury instructions were [not] so clearly erroneous as to likely produce a grave miscarriage of justice." *Combs*, 33 F.3d at 669

(citation omitted). The district court therefore did not commit plain error, and reversal on this ground is not warranted. *See id.*

**C.      Insufficiency-of-the-evidence claim**

In reviewing an insufficiency-of-the-evidence claim, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003) (quotation marks omitted). "We are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir.1990).

There are three elements to the crime of being a felon in possession of a firearm: "(1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that the firearm had traveled in or affected interstate commerce." *United States v. Moreno*, 933 F.2d 362, 372 n.1 (6th Cir. 1991) (citation omitted). The parties stipulated to elements one and three, so Newsom's insufficiency challenge on appeal goes only to the second element.

In this case, the government's theory was that Newsom constructively possessed the firearm found under the driver's seat of the SUV in question. "Evidence of constructive possession suffices to satisfy the requirement under § 922(g)(1) of proof that a defendant possessed a firearm, and constructive possession, in turn, exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Hadley*, 431 F.3d at 507 (citation and quotation marks omitted). Moreover, constructive possession may be proven by either direct or circumstantial evidence. *Id.*

The government points to eight pieces of evidence that allegedly support the possession element: (1) that Newsom was the driver and sole occupant of the vehicle, (2) that he failed to stop after the officer signaled with his lights, (3) that the officer saw Newsom lean forward in the vehicle as if he was concealing an object, (4) that Newsom gave a false identification to the officer and was evasive in his responses to the officer's questions, (5) that the firearm, magazine, and a round of ammunition were located close to Newsom, and the round was located in plain view on the floorboard, (6) that the location of the round on the floorboard plus Newsom's movements before the officer approached the vehicle were consistent with Newsom having ejected a bullet from the chamber of the firearm, (7) that Newsom told the officer that the gun was not stolen, which demonstrated his knowledge of the firearm, and finally (8) that Newsom admitted that he "had that gun" to the federal officers who arrested him.

The fact that Newsom was the only person in the SUV where the gun was found underneath his seat supports the conclusion that Newsom had the power to exercise dominion and control over the firearm. But the defendant's mere presence in a car where a gun is found and proximity to a gun are insufficient proof of constructive possession. *See United States v. Blue*, 957 F.2d 106, 108 (4th Cir. 1992) (reversing upon a finding of insufficient evidence of possession where a gun was found under the passenger seat in which Blue was riding, despite an officer's testimony that he saw Blue's shoulder dip as if he was concealing something under the seat); *see also United States v. Beverly*, 750 F.2d 34, 37 (6th Cir. 1984) (finding insufficient evidence of possession where two guns were found in a waste basket near Beverly, despite the fact that one of the guns carried Beverly's fingerprint).

In the present case, however, other evidence supports the inference that Newsom actually possessed the gun immediately prior to the officer approaching the vehicle. The police officer who pulled Newsom over testified that Newsom "appeared . . . as if he was maybe putting something

under the seat" because he made a "movement towards the front where the upper part of their body will disappear momentarily." Furthermore, the government introduced the officer's testimony concerning Newsom's movements in the vehicle coupled with the location of the bullet on the floorboard, facts that support the inference that Newsom ejected a bullet from the chamber of the firearm just before the officer approached the vehicle.

This circumstantial evidence of Newsom's possession is bolstered by two statements made by Newsom, one establishing that he at least knew of the gun's presence, and the other conceding that he actually possessed it at some point. When the arresting officer asked Newsom whether the gun was stolen, Newsom replied that it was not. This response indicates Newsom's knowledge of the firearm. Then when Newsom was later arrested by federal agents, Newsom allegedly said something to the effect of "I had that gun." Newsom contends that he never made such a statement, but actually said that he "might as well say the gun is mine." In reviewing this insufficiency-of-the-evidence claim, however, we are bound to resolve credibility issues in support of the jury's verdict. *See Hughes*, 895 F.2d at 1140. Accepting the agents' version of the discussion with Newsom and viewing the evidence in the light most favorable to the prosecution—as we must, *see id.*; *Copeland*, 321 F.3d at 600—the jury was entitled to believe that Newsom's statement about having the gun showed that he had actually possessed it.

Taken together, the circumstantial evidence of Newsom's possession plus his own statements easily support his conviction. The fact the gun was found within an arm's reach of Newsom and under his seat, which alone is not sufficient to sustain a conviction, can certainly be a factor to be considered by the reviewing court. *See United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003) ("Although 'mere proximity' to a gun is insufficient to establish constructive possession, evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise—coupled with proximity may suffice.") (citation and quotation marks omitted). In addition, the evidence of Newsom's actual possession (the evidence that supports the inference that Newsom had just ejected a bullet from the chamber of the firearm plus his own statement that he "had the gun") demonstrate his knowledge that the gun was present under his seat.

Weighing all of this evidence in the light most favorable to the prosecution, the jury had before it sufficient evidence to find that Newsom "knowingly ha[d] the power and the intention at a given time to exercise dominion and control over" the gun. *See Hadley*, 431 F.3d at 507. Because we conclude that the foregoing evidence was sufficient to support the jury's guilty verdict, we need not resolve the question of whether Newsom's failure to stop the vehicle promptly, his furnishing of false identification, and his evasiveness in responding to the officer's questions could also support his conviction.

### D.     Propriety of Newsom's sentence

Newsom was sentenced in December of 2004, a month before *Booker* was decided. He argues, and the government concedes, that this court's post-*Booker* cases require us to vacate his sentence and remand the case to the district court for resentencing. *See United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005) (holding that sentencing under the mandatory Guidelines regime creates a presumption of prejudice that the government must rebut with "clear and specific evidence that the district court would not have . . . sentenced the defendant to a lower sentence" if it had treated the Guidelines as advisory ). No such evidence has been presented in this case. We therefore vacate Newsom's sentence and remand for resentencing consistent with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Newsom's conviction, but **VACATE** his sentence and **REMAND** the case for resentencing pursuant to *Booker*.