**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0437n.06

No. 12-3373

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 30, 2013*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| ERIC TUTSTONE, | ) | |
| | ) | OPINION |
| Defendant – Appellant. | ) | |
| | ) | |

Before: MOORE and STRANCH, Circuit Judges; HOOD, District Judge.[*]

**JANE B. STRANCH**, Circuit Judge. Defendant Eric Tutstone appeals his convictions for juvenile sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(2), & 1594(a), and financially benefitting from juvenile sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). He seeks reversal on the grounds that the government failed to prove his conduct was "in or affecting" interstate commerce, the testimony of a federal agent constituted inadmissible hearsay and denied him the right to confrontation, and the government failed to prove he violated § 1591(a)(2). For the reasons explained below, we AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

Sumara Venson Banos worked part-time as a madam for ten years. She ended that work after receiving an increasing number of requests from male clients to supply them with minor females for

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

sexual encounters. Banos contacted law enforcement about her concerns and agreed to work as an FBI informant.

Banos asked her former husband if he knew any men who could supply her with minor females for prostitution, and he gave her Tutstone's telephone number. Between December 7 and 9, 2010, Banos engaged in a series of recorded telephone conversations with Tutstone using a TracFone cellular phone that was paid for by the FBI. Identifying herself in these conversations as "Marie," Banos explored whether Tutstone would help her recruit into prostitution young females around sixteen or seventeen years of age.

Tutstone accepted Banos's request, offering to sell her his sixteen-year old neighbor, S.J. Tutstone befriended S.J. in the summer of 2010 after learning that she and her mother were engaged in ongoing conflict. In the fall of 2010, Tutstone talked with S.J. on the telephone and visited with her at his home, but at no time did he meet S.J.'s mother, nor did S.J. want him to meet her. On one occasion in November, Tutstone took photographs of S.J. after she disrobed from the waist down at his request. He asked S.J. what it would cost to have sex with her, but she rebuffed his request to buy sex.

After that episode, S.J. decreased her contact with Tutstone. Their friendship rekindled, however, when Tutstone called her in December after agreeing to recruit minors for Banos. During several phone calls, Tutstone encouraged S.J. to leave home, work for "Marie," and make a lot of money having sex or phone sex with men. S.J. understood from these conversations that "Marie" had females working for her and that Tutstone wanted her to work for "Marie" having sex with men.

To facilitate a purchase of S.J. from Tutstone, Banos talked with S.J. and Tutstone separately by phone and, on at least one occasion, she spoke with both of them on a three-way call. During the

phone calls in which S.J. participated, Banos explained her role as a madam, told S.J. that she would have sex with men for money, and answered S.J.'s questions. Banos assured S.J. that she would lead a glamorous lifestyle of wealth and travel and that she would not be raped, abused, or drugged. Tutstone privately assured Banos that S.J. was ready to work for her and that he could control S.J. if Banos had any problems with her. S.J. told the jury that she wanted to work for "Marie" because she was still having trouble with her mother and she wanted to leave home.

On December 9, Banos met Tutstone for the first time at a Starbucks in downtown Cleveland. She surreptitiously videotaped their meeting while law enforcement officers conducted surveillance inside and outside the store. During the conversation, Tutstone agreed to sell S.J. to Banos for $300 dollars. To consummate the deal, Banos and Tutstone planned to meet at the same location later the same day after S.J.'s school day ended. Before the second meeting, FBI Agent Tim Kolonick provided Banos with prerecorded buy money to complete the purchase.

Tutstone returned to the Starbucks at the appointed time, accompanied by his girlfriend and S.J. Banos also videotaped this second, short meeting. She handed Tutstone $300, took S.J. by the arm, and walked to a predesignated location to meet law enforcement personnel. Tutstone was arrested as he left the Starbucks with the buy money in his pocket.

Once in custody, Tutstone waived his *Miranda* rights and confessed that he knew S.J. was only sixteen years old. He thought "Marie" wanted S.J. to work in the phone sex business, but as the transaction closed, "Marie" told him that she would require S.J. to engage in prostitution. Agent Kolonick reduced Tutstone's statement to writing. Tutstone agreed the statement was accurate by signing it and initialing each paragraph.

In addition to this evidence, the government introduced during its case-in-chief a certified copy of S.J.'s birth certificate confirming her birth in 1994; cell phone records for the TracFone Banos used to communicate with Tutstone, which were admitted under the business records exception; and the expert testimony of FBI Agent Kevin Horan, who explained the relationship of cellular telephones to interstate commerce. Tutstone testified in his own defense, but he did not call any witnesses.

At the conclusion of the government's case and again at the close of the evidence, Tutstone moved for a judgment of acquittal under Federal Rules of Criminal Procedure 29. He argued that the government failed to prove his conduct was "in or affecting interstate or foreign commerce" as required by 18 U.S.C. § 1591(a) and as charged in the indictment because all of the conduct, including the cell phone calls, occurred within the State of Ohio.

The district court denied the motions in light of Agent Horan's testimony establishing a nexus between the cell phone calls and interstate commerce. The court also rejected Tutstone's claim that the proof did not support a conviction under § 1591(a)(2).

The jury convicted Tutstone on both counts. The district court imposed a sentence of imprisonment of 135 months on each count, to be served concurrently. We have jurisdiction of this timely appeal under 28 U.S.C. § 1291.

## II. STANDARDS OF REVIEW

We review de novo the district court's denial of a motion for a judgment of acquittal, and in doing so we view the trial evidence in the light most favorable to the government and give that party the benefit of all reasonable inferences to be drawn from the evidence. *See United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). The question we must answer when considering a challenge to

4

the sufficiency of the evidence is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). A defendant must carry a very heavy burden to show that the evidence presented at his trial was insufficient to convict him. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006).

If the defendant objects on appeal to the admission of evidence at trial without having objected in the court below, we review the claim for plain error. *See United States v. Demjanjuk*, 367 F.3d 623, 630 (6th Cir. 2004). To establish plain error, the defendant must show: (1) an error; (2) the error was plain; and (3) the error affected his substantial rights. *See United States v. Newsom*, 452 F.3d 593, 602 (6th Cir. 2006). If these three factors are shown, we consider whether the error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *Id.* at 602–03.

## III. DISCUSSION

Two of Tutstone's arguments relate to whether the government presented sufficient evidence to prove to the jury beyond a reasonable doubt that his conduct was "in or affecting" interstate commerce as provided in 18 U.S.C. § 1591 and as charged in the indictment. We address these interrelated arguments first because the outcome of our analysis affects both counts of conviction. We then consider whether the government proved Tutstone guilty of benefitting financially from juvenile sex trafficking in violation of 18 U.S.C. § 1591(a)(2), as charged in the second count of the indictment.

5

## A. Proof of interstate nexus

The statute under which Tutstone was convicted provides as follows:

(a) Whoever knowingly—

    (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

    (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or in reckless disregard of the fact, . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591. An attempt is punished like the completed crime. 18 U.S.C. § 1594(a).

Congress enacted these statutes as part of a comprehensive regulatory scheme known as the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub.L. No. 106-386, 114 Stat. 1464 (Oct. 28, 2000) (codified as amended in various sections of the United States Code). The TVPA criminalizes sex trafficking of children as well as sex trafficking of adults that is accomplished through force, fraud, or coercion. *United States v. Evans*, 476 F.3d 1176, 1179 & n.1 (11th Cir. 2007). In passing the TVPA, Congress was concerned that rapid expansion of the sex industry had brought about "sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services." 22 U.S.C. § 7101(b)(2). "Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities," luring them "into their networks through false promises of decent working conditions at relatively good pay. . . ." 22 U.S.C. § 7101(b)(4). Congress specifically found that

6

these widespread activities "substantially affect[] interstate and foreign commerce." 22 U.S.C. § 7101(b)(12).

Tutstone contends that all of his conduct involving S.J.—including the cell phone calls to and from Banos—occurred within the State of Ohio and therefore, the government failed to prove his conduct had any connection to interstate commerce as set forth in § 1591 and as charged in the indictment. Because the government failed to carry its burden of proof, Tutstone argues that his motions for a judgment of acquittal should have been granted.[1] We do not agree.

To demonstrate a connection between Tutstone's conduct and interstate commerce, the government introduced into evidence the call detail records for the TracFone Banos used to communicate with Tutstone along with the expert testimony of FBI Agent Horan. Before joining the FBI's Cellular Analysis Survey Team ("CAST"), Agent Horan completed two months of specialized training on how cellular telephones and networks operate. As part of that training, representatives of the major cellular service providers led the training participants on tours of their complexes and also made presentations about the method of function and capabilities of their facilities and networks. Since completing the CAST training, Agent Horan has provided full-time assistance to law enforcement in hundreds of cases nationwide involving cellular and network technology, and he has also testified as an expert witness in federal and state courts.

Based on his training and experience, Agent Horan testified that TracFone is known as a Mobile Virtual Network Operator. It does not maintain infrastructure or own any cell towers. Instead, TracFone leases mobile cellular service from AT&T so that TracFone customers can utilize

---

[1]Tutstone does not argue on appeal that the statutes under which he was charged are unconstitutional facially or as applied to him.

7

AT&T's interstate network. Neither AT&T nor TracFone maintain any billing facilities in Ohio and no cellular telephones are manufactured in Ohio. Rather, the parts for cell phones and cell towers are made in Asia, Mexico, and Germany.

Agent Horan explained to the jury that a call sent between cell phones located within Ohio is not limited to communication facilities within Ohio. When a message is sent, the cell phone establishes radio communication with a cell tower within Ohio. Switches within the network efficiently determine how and where to route the data. Although there are mobile switching centers in Ohio, the switches may route data through more than one network computer database located in other states before the call arrives at its intended destination in Ohio. Agent Horan agreed it is possible that the content of a cell phone call could travel solely through switches located within Ohio. But even if that occurred, there would still be a connection to interstate commerce because call data are simultaneously routed to a billing gateway located in another state to account for the cost of using the network. AT&T's billing gateway is located in New York, and TracFone's is located in Florida. In addition, Agent Horan testified, any AT&T cell phone calls that are remotely monitored by wiretap are diverted from AT&T's headquarters in New York or TracFone's headquarters in Florida to the FBI's facility in Quantico, Virginia.

Agent Horan's testimony provided the jury with sufficient evidence to find that the cell phone calls between Tutstone and Banos in Ohio relating to the purchase of S.J. for the purpose of committing commercial sex acts were "in or affecting" interstate commerce, as required by § 1591 and as charged in the indictment. Our conclusion is unaffected by Tutstone's argument, made for the first time on appeal, that Agent Horan's testimony included inadmissible hearsay that violated

8

his confrontation rights. We review this contention only for plain error and reject it. *See Newsom*, 452 F.3d at 602–03.

Hearsay is defined as "a statement that . . . the declarant does not make while testifying at the current trial or hearing . . . and a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007). Agent Horan did not testify to any hearsay statements as defined by Rule 801(c); he did not introduce an out-of-court testimonial statement for the truth of the matter asserted. Accordingly, the Confrontation Clause was not triggered. *See United States v. Warman*, 578 F.3d 320, 346 (6th Cir. 2009). In any event, Tutstone exercised his right to confront Agent Horan. *See id.*

The district court properly admitted Agent Horan's testimony because his specialized knowledge, experience, and training helped the jury to understand technical aspects of the government's proof and to determine a fact in issue—the interstate commerce element of the crimes. *See* Fed. R. Evid. 702. We have previously approved of expert testimony given by qualified federal agents. *See United States v. Nixon*, 694 F.3d 623, 628–30 (6th Cir. 2012); *United States v. Ham*, 628 F.3d 801, 804–05 (6th Cir. 2011); *Abboud*, 438 F.3d at 586–87. Tutstone does not contend that Agent Horan's testimony lacked sufficient facts or that his testimony was unreliable. Fed. R. Evid. 702. In short, we are not persuaded that the admission of his testimony amounted to plain error. *See Newsom*, 452 F.3d at 602–03.

To summarize, the government presented sufficient proof to connect Tutstone's conduct within Ohio to interstate commerce as provided in § 1591 and as charged in both counts of the indictment. *See Abboud*, 438 F.3d at 589; *United States v. Wild*, 143 F. App'x 938, 943 (10th Cir. 2005) (holding government presented sufficient proof of interstate nexus to uphold conviction under

§ 1591(a)(2)). Consequently, we conclude that the district court properly denied Tutstone's motions for a judgment of acquittal on this ground.

**B. Tutstone's conviction under § 1591(a)(2)**

In count two of the indictment, the government charged Tutstone with a violation of 18 U.S.C. § 1591(a)(2). One of the elements the jury had to find to convict on this offense is that Tutstone knew or recklessly disregarded the fact that S.J. "will be caused to engage in a commercial sex act." *Id.* Because Tutstone's arrest arose from a sting operation and neither Banos nor the government ever meant for S.J. to engage in a commercial sex act, Tutstone argues that he could not have committed the offense charged. He insists that wrongful intent is not an element of the offense, and he points out that the government did not charge him with attempt under 18 U.S.C. § 1594(a) in count two, as it did in count one.

The government asserts that Tutstone waived this argument because he did not include it as a ground for relief below when he twice moved for judgment of acquittal under Rule 29. *See United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005); *United States v. Alatrash*, 460 F. App'x 487, 491 (6th Cir. 2012). Instead, Tutstone suggested there was no proof he thought Banos would use S.J. for anything other than phone sex. Tutstone did not respond to this waiver argument in his reply brief. Although the question is close, we conclude that Tutstone's present contention was subsumed within the issue he presented to the district court and no waiver occurred. Nonetheless, we reject his argument on the merits.

"When an act of Congress requires knowledge of a future action, it does not require knowledge in the sense of certainty as to a future act." *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010). Rather, the defendant must know "of an established modus operandi that will in the

10

future cause a person to engage in prostitution." *Id.* In *Todd*, the Ninth Circuit affirmed a conviction under § 1591(a)(1) where the government proved the defendant knew that women would be caused to engage in commercial sex acts. *Id.* at 333–34.

A reasonable jury could find on the evidence presented in this case that Tutstone knowingly sold S.J. to Banos for $300 with full knowledge that S.J. would be caused to engage in commercial sex acts with Banos's customers. 18 U.S.C. § 1591(a)(2); *United States v. Brooks*, 610 F.3d 1186, 1197 (9th Cir. 2010) (TVPA case); *Todd*, 627 F.3d at 333–34 (same); *United States v. Warren*, 491 F. App'x 775, 778 (8th Cir. 2012) (per curiam) (same). S.J. testified that Tutstone enticed her to make money having sex with Marie's customers. Tutstone admitted to the police during a voluntary post-arrest interview that Banos told him she would require S.J. to perform commercial sex acts with paying customers. This new information did not prompt Tutstone to terminate the sale. Instead, he accepted the $300 payment and allowed S.J. to leave the Starbucks with Banos. The videotape played to the jury confirms that Banos informed Tutstone she had a customer waiting to receive sexual services from S.J. as soon as Banos could make her available to the customer. Based on these facts, the jury reasonably could have disregarded Tutstone's claim that he did not know he was selling S.J. into prostitution. Because the government presented sufficient proof that Tutstone completed the substantive crime when he accepted payment and handed S.J. over to Banos, *see Jackson*, 443 U.S. at 319, the government did not have to resort to charging and proving an attempt to commit the crime under § 1594(a).

## IV. CONCLUSION

Tutstone's motions for a judgment of acquittal under Rule 29 were properly denied. The government proved that Tutstone's conduct was "in or affecting" interstate commerce and that

11

Tutstone benefitted financially when he sold S.J. to Banos for money with knowledge that Banos would cause S.J. to engage in prostitution. Accordingly, we AFFIRM.