*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0434p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                  *Plaintiff-Appellee*,

        *v.*

DONNELL CAMPBELL,

                  *Defendant-Appellant*.

No. 06-6094

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 05-20237—Jon Phipps McCalla, Chief District Judge.

Argued: February 6, 2008

Decided and Filed: December 2, 2008

Before: BOGGS, Chief Judge; BATCHELDER and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Edwin Greg Gilluly, Jr., ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Edwin Greg Gilluly, Jr., ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

      GRIFFIN, Circuit Judge. Defendant Donnell Campbell appeals his jury trial conviction on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). For the reasons set forth below, we affirm.

I.

      Donnell Campbell's conviction stems from events that transpired on the evening of February 15, 2005, in Memphis, Tennessee. While on routine patrol at approximately 7:30 p.m., Memphis Police Officer Valerie Brady observed an automobile parked in a dark secluded area under a viaduct. The vehicle was parked with its lights out and the engine off on a privately owned railway access road near abandoned apartment buildings. The location was neither open to through traffic nor designated for parking. Officer Brady described the location as a "hot spot" – a high-crime area that was the site of drug sales, prostitution, and car theft. She observed two occupants in the car – a driver and a passenger, later identified as Campbell, who was partially obscured from

view because he was slumped down in the front passenger seat. She could only see the passenger's head. Officer Brady radioed the dispatcher to request a check on the license plate. She was advised that the "tags were not on file," indicating, from her perspective, a possibility that the vehicle might be stolen.

Concerned for her safety, Officer Brady called for backup. She turned on the patrol car's overhead lights and two spotlights to illuminate the parked vehicle. The driver started the engine and attempted to leave, but stopped when Brady activated the siren. Officer Brady approached the driver's side of the vehicle and asked the occupants what they were doing under the bridge. The female driver stated that she and the passenger, a co-worker, were just having a conversation. The passenger, on the other hand, responded that he was there for a sexual favor. Upon the officer's request, the driver, Jane Johnson Wright, produced identification, but Campbell allegedly stated that he had none. Officer Brady did not obtain any identification from Campbell at that time. Officer Brady then asked Wright to step out of the vehicle and placed her in the back seat of the squad car while she verified the vehicle registration and Wright's identification.

A second patrol car arrived almost immediately on the scene. Officer Brady apprised Officers Kosso and Giacollini of the circumstances and then returned to her patrol car to await a response from the dispatcher on the status of the license plate tags. She estimated that the verification took approximately ten to fifteen minutes. In the meantime, Officer Kosso approached the parked vehicle. According to Kosso, Campbell was slouched down in the passenger seat with his hands out of sight, as if attempting to avoid detection. Kosso asked Campbell for identification, but Campbell allegedly replied that he had no identification with him. Kosso then ordered Campbell to get out of the car and conducted a patdown. He detected a large bulge in Campbell's right front pocket which, based upon experience and feel, he believed to be drug contraband. Officer Kosso removed a large baggy that contained seven individually wrapped bags of marijuana from Campbell's pocket. The marijuana was packaged in a manner consistent with resale or distribution. Based upon this discovery, Kosso placed Campbell under arrest, handcuffed him, and conducted a full body search for possible weapons and additional contraband. He found an identification card in Campbell's back pocket, but no other items. Officer Kosso moved Campbell to the back seat of his squad car and eventually transported him to the jail.

Officer Kosso testified that his interaction with Campbell lasted approximately five minutes. While this encounter was taking place, Officer Brady remained in her patrol car with Wright, still awaiting a response from the dispatcher as to whether the vehicle was legally registered.

Shortly after Campbell's arrest, a fourth officer, John Quinn, arrived at the scene. He was briefed on the situation by the other officers and approached Wright's car with a flashlight. Standing outside of the car, he shined the flashlight inside the car through the open passenger-side door and observed the butt end of a handgun protruding from under the front passenger seat. He retrieved the weapon, which was a loaded Colt .380-caliber semi-automatic handgun.

Officer Brady determined ultimately through communications with central dispatch that the vehicle was registered to Wright and was not stolen. She therefore allowed Wright to return to her vehicle and leave the scene.

In his testimony at the suppression hearing, Campbell disputed the officers' accounts regarding their requests for identification. According to Campbell, when Officer Brady asked him if he had identification, he responded that he did, but she did not ask to see it and returned to her patrol car with Wright. Campbell further testified that when Officer Kosso approached the passenger side of the vehicle, he told the officer that he had identification in his pocket, but Kosso nonetheless ordered him to step outside the car and then proceeded to search him. Campbell claimed

that Kosso reached into his pockets before patting them down and then removed the contraband and his identification card.

Campbell was indicted on two counts – being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count One) and possession of a firearm after having been convicted of a domestic violence crime in violation of 18 U.S.C. § 922(g) (Count Two). He pleaded not guilty on both counts and filed a motion to suppress evidence discovered during the traffic stop. Following an evidentiary hearing, the district court issued an order denying the motion. The grand jury thereafter issued a superseding indictment, which restated the charges in the first indictment and added a count of possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count Three). Campbell again pleaded not guilty on all counts, and the case proceeded to trial on May 1, 2006.

On the first day of trial, the government voluntarily dismissed Count Two. At the conclusion of the trial, defense counsel moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, but the district court denied the motion. The jury returned a verdict of guilty on Count One, but found Campbell not guilty on Count Three. On August 17, 2006, the district court sentenced Campbell to 293 months of imprisonment and five years of supervised release.

In his timely appeal, Campbell challenges the district court's order denying his motion to suppress evidence and the sufficiency of the evidence. He further contends that he received ineffective assistance of counsel at trial. In his pro se brief, Campbell also raises a claim of prosecutorial misconduct.

II.

Campbell first contends that the district court erred in denying his motion to suppress evidence, asserting that the patdown and the search of the vehicle exceeded the permissible scope of the investigatory traffic stop under *Terry v. Ohio*, 392 U.S. 1 (1968). He maintains that the initial purpose of the stop – to determine whether the vehicle in which he was a passenger was stolen or properly registered – was resolved and thus was no longer a factor at the time of Officer Kosso's patdown. Campbell argues that there is no evidence that he was armed and dangerous or that there was a threat to the officers' safety so as to validate the search of his person and the vehicle.

When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). The reasonableness of a search and seizure under the Fourth Amendment is a question of law. *Id.* The specific determination of whether reasonable suspicion of criminal activity exists to justify a traffic stop is a mixed question of law and fact which we review de novo. *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008). In reviewing the propriety of a district court's denial of a motion to suppress, we consider the evidence in the light most favorable to the government. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006).

The protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (internal citation and quotation marks omitted). However, pursuant to *Terry*, a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot. In such circumstances, the officer may conduct a brief traffic stop for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions. *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). Reasonable suspicion "'requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity

based on specific and articulable facts, he may conduct a *Terry* stop.'" *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)).

The lawfulness of an investigatory stop is judged by the totality of the circumstances to "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (internal citation and quotation marks omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (internal citation and quotation marks omitted). Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred. *Pearce*, 531 F.3d at 383; *Dorsey*, 517 F.3d at 395. "[W]hile an 'individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime,' police 'officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Pearce*, 531 F.3d at 383 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

Not only the driver of a stopped vehicle, but a passenger as well, is seized within the meaning of the Fourth Amendment and thus may challenge the legality of the stop. *Brendlin v. California*, — U.S. — , 127 S. Ct. 2400, 2403, 168 L. Ed. 2d 132 (2007). Consequently, "'[i]f either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit.'" *Id.* at 2408 (quoting 6 W. LaFave, *Search and Seizure* § 11.3(e), pp. 194, 195, and n. 277 (4th ed. 2004 and Supp. 2007)).

In the present case, considering the totality of the circumstances, we agree with the district court that the initial stop fell within the acceptable parameters of a lawful *Terry* stop based upon a reasonable suspicion of criminal activity. The cumulative observations of Officer Brady – a vehicle parked with its lights out and engine off under a viaduct in a dark area in a high crime neighborhood, license tags that were reportedly "not on file," the driver's attempt to drive away from the patrol car, the occupants' conflicting responses as to why they were there, and defendant's lack of identification and his furtive posture – constituted an objectively reasonable basis to temporarily detain the occupants to determine whether the vehicle was properly registered or if criminal activity was afoot, i.e., the car was stolen. *See Pearce*, 531 F.3d at 382-83 (finding reasonable suspicion of criminal activity to justify stopping the defendant where the officer observed the defendant, in a high-crime area on street where a recent homicide had occurred, "exit a vehicle, glance towards him, hunch over, place his right hand in the small of his back [suggestive of carrying a gun], and start backing away."); *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) (holding that officers had reasonable suspicion that the defendant was engaged in criminal activity where, in a high-crime area, the defendant's hand movements were consistent with drug-dealing and he attempted to evade police upon noticing them); *United States v. Stephens*, 350 F.3d 778, 779-80 (8th Cir. 2003) (holding that police had reasonable suspicion to conduct traffic stop to investigate whether the defendant's vehicle was properly registered where dispatch computer check performed immediately before the stop indicated that vehicle's license plate tags were "not on file" and the defendant's driver's license had expired); *United States v. Clay*, 181 F. App'x 542, 544 (6th Cir. 2006) (police officer had reasonable suspicion to approach parked vehicle and question the defendant driver where car was parked in front of abandoned house in high-crime and drug area and occupants made furtive motions with their hands as he drove by).

The key issue in the present case, however, is whether Officer Kosso exceeded the permissible scope of the initial stop by removing Campbell from the car and conducting a patdown. "A lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005). A *Terry* stop must not only be justified at its inception, but also "must be reasonably related in scope to the circumstances which justified the interference in the first place." *Blair*, 524 F.3d at 750. The detention must last no longer than is necessary to carry out the purpose of the stop; otherwise, it may become an arrest that must be supported by probable cause. *Dorsey*, 517 F.3d at 398; *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). The propriety of the intrusion is judged by examining the reasonableness of the officers' conduct in light of the surrounding circumstances and their suspicions. *Luqman*, 522 F.3d at 616-17.

It is well established that safety concerns are an integral factor in the *Terry*-stop equation. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat-down searches upon reasonable suspicion that they may be *armed* and *dangerous*." *Bennett*, 410 F.3d at 822 (emphasis in original) (internal citations and quotation marks omitted). Moreover, "'the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *Butler*, 223 F.3d at 374 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). A court reviewing a suppression motion must determine whether a reasonably prudent person in the circumstances would be warranted in believing that his safety or that of others was in danger. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007).

Here, Officer Kosso testified at the suppression hearing that the situation spurred safety concerns in his mind for several reasons. When he arrived upon the scene, Officer Brady relayed the details of the stop and her observations to him, including the facts that the "darked out" vehicle was parked in a secluded, high-crime area, the license tags were not on file, raising suspicions that the car might be stolen, and the passenger had no identification, possibly to conceal his identity. Moreover, both officers observed Campbell slouched down in the passenger seat as if to avoid detection and with his hands out of sight, suggestive of concealing a weapon. Thus, Officer Kosso testified that in an effort to verify the passenger's identity, check for any outstanding warrants, and to protect himself and the other officers, he asked Campbell to step out of the vehicle and patted him down.

We conclude that a reasonably prudent person in these circumstances would be warranted in believing that his safety or that of others was in danger. Significantly, Officer Kosso's actions with regard to Campbell occurred separately from, but simultaneously with, Officer Brady's investigation into the status of the vehicle registration. Pending the completion of Officer Brady's communication with dispatch about the license tag issue, Officer Kosso requested that Campbell exit the car and patted him down. In this context, Campbell's brief detention and patdown did not exceed the purpose and objective of the initial stop. "[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop." *United States v. Shank*, — F.3d — , 2008 WL 4273129, at *3 (6th Cir. Sept. 19, 2008) (internal citations and quotation marks omitted). Here, based on the information provided to him by Officer Brady and his own observations, Officer Kosso had legitimate grounds for conducting a patdown of Campbell for weapons while Officer Brady's license tag check was still ongoing.

Officer Kosso's patdown, in turn, indicated the presence of contraband. Pursuant to the plain-feel doctrine, "an officer may seize an object whose contour or mass makes its identity as contraband immediately apparent." *Garcia*, 496 F.3d at 505 (internal citation and quotation marks omitted). Officer Kosso testified that the large bulge he felt in Campbell's front pocket was, based

on his experience, usually drug contraband. The discovery of the marijuana gave Officer Kosso probable cause to arrest Campbell.

As the district court properly determined, the firearm was thereafter legally seized by Officer Quinn pursuant to the plain-view exception to the warrant requirement. "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) (quoting *Texas v. Brown*, 460 U.S. 730, 740 (1983)).

Officer Quinn testified that when he arrived on the scene after Campbell's arrest, the passenger-side door of the vehicle was still open. He walked to the side of the car and, standing outside of the vehicle, shined his flashlight through the open door. The butt of a handgun was visible under the passenger seat. He then lawfully confiscated the gun and tagged it as evidence.

In sum, contrary to Campbell's contention, we conclude that no constitutional violations occurred during the *Terry* stop that warrant suppression of the fruits of the legal search and seizure. The district court therefore properly denied Campbell's motion to suppress evidence.

III.

Campbell next argues that the evidence adduced at trial was insufficient as a matter of law to sustain his conviction for being a felon in possession of a firearm. Specifically, he maintains that the evidence does not show that he possessed the handgun specified in Count One of the indictment – a .380-caliber Colt semi-automatic pistol.

In reviewing Campbell's claim that his Rule 29 motion for judgment of acquittal should have been granted on grounds of insufficient evidence, we review his motion de novo and examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007). We will reverse a judgment based on a finding of insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole. *Id*. When engaged in this analysis, we are bound to make all reasonable inferences and credibility choices in support of the verdict. *United States v. Newsom*, 452 F.3d 593, 608 (6th Cir. 2006).

The offense of being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g) is comprised of three elements: (1) the defendant had a previous felony conviction; (2) the defendant knowingly possessed the firearm specified in the indictment; and (3) the firearm traveled in or affected interstate commerce. *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003). Only the element of possession is in dispute in the present case. Campbell contends that because Wright, the government's primary witness, testified at trial that the handgun retrieved from the vehicle was not the same handgun she observed him holding prior to the traffic stop, and she did not observe him place any handgun under the front passenger seat of her car, there is no evidence to establish that he possessed, either actually or constructively, the Colt pistol that was the object of the indictment.

Pursuant to 18 U.S.C. § 922(g)(1), a conviction may be based on actual or constructive possession of a firearm. *Grubbs*, 506 F.3d at 439. Actual possession requires that a defendant have immediate possession or control of the firearm, whereas constructive possession exists when the defendant "does not have possession but instead knowingly has the power and intention at a given

time to exercise dominion and control over an object, either directly or through others." *Id.* (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)). The element of possession can be proven by either direct or circumstantial evidence. *Newsom*, 452 F.3d at 609. However, "[t]he defendant's mere presence in a car where a gun is found and proximity to a gun are insufficient proof of constructive possession." *Id. See also United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc) ("*Presence alone* near a gun . . . does not show the requisite knowledge, power, or intention to exercise control over the gun to prove constructive possession.") (internal citation and quotation marks omitted). Other incriminating evidence must supplement a defendant's proximity to a firearm in order to tip the scale in favor of constructive possession. *Grubbs*, 506 F.3d at 439. Consequently, "'evidence of some other factor – including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise – coupled with proximity may suffice.'" *Newsom*, 452 F.3d at 610 (quoting *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003)).

Moreover, "it is not enough that the defendant possessed a firearm at some unidentified point in the past; the evidence must prove that the defendant possessed the same handgun identified in the indictment." *Grubbs*, 506 F.3d at 439 (internal citation and quotation marks omitted). *See also Schreane*, 331 F.3d at 560 (evidence must show that the defendant "knowingly possess[ed] the firearm and ammunition specified in the indictment.").

In *Arnold*, we surveyed a broad spectrum of felon-in-possession cases in which we have evaluated the sufficiency of the evidence to determine whether a defendant's alleged "mere presence" near a weapon will sustain a conviction. *See Arnold*, 486 F.3d at 181-84. We need not reiterate this precedent in detail, but conclude that the present circumstances most closely resemble those factual scenarios in which we have found a sufficient link between the weapon and the defendant so as to establish the requisite element of constructive possession. Here, there exists the additional incriminatory evidence to support a reasonable inference that Campbell constructively possessed the Colt pistol found in Wright's car under the passenger seat.

Wright testified at trial that on the day in question, Campbell, her friend, called and asked her to drive him and his infant daughter to the baby's mother's house. At approximately 4 p.m., Wright picked up Campbell and his daughter at a house owned by Campbell's friend, an individual nicknamed "T-Mack." When she arrived, Campbell was on the porch holding his daughter. T-Mack and another male unfamiliar to Wright were also on the porch. Campbell placed his daughter in the back seat of Wright's car and got into the front passenger seat. At the same time, the unidentified male entered the car, sat in the back seat, and handed a gun to Campbell. The two men were discussing a recent incident in which someone shot at the gas tank of Campbell's car. The men then exited the car, and Campbell walked back inside the house, telling Wright that he was going to take the gun back to the house. Wright "thought he was putting the gun back up." Shortly thereafter, Campbell came out of the house and returned to Wright's vehicle. Wright testified that she did not see Campbell either holding a gun or putting a gun under the seat. Wright and Campbell dropped off his daughter at her mother's house and then drove around for a while before parking under the viaduct, where Campbell wanted Wright to engage in sex. At that point, Officer Brady arrived and approached the car.

At the scene, the officers did not show Wright the pistol discovered under the passenger seat, but asked if it belonged to her. She denied ownership or any knowledge of the pistol. Wright never told the investigating officers that someone had given Campbell a gun earlier that day. When the Colt pistol taken from her car was introduced as an exhibit by the government, Wright testified that she had never seen this particular handgun before and stated that it did not look like the gun that was handed to Campbell by the unknown male in the backseat of her car. She explained, "[t]he gun that he said he was taking back up to the house, that gun was another type of gun, it was a little bigger,

it was silver." She also told the jury that she never observed Campbell place a handgun of any kind under the front seat of her vehicle; nor did he make any remarks about a handgun.

Wright testified that she never carried a gun and did not put the pistol under the seat. She was the sole driver of her car, and it was not loaned to anyone on a regular basis. Although she transported her relatives in the car on a frequent basis, she explained, "I have my nephews, nieces in my car, they help me clean out my car, I'm quite sure if there would have been a gun in my car, they would have known and they would have told me."

Significantly, Wright testified that the day after his arrest, Campbell called her and told her that she "could have [taken] that [gun] charge" and "[said] the gun was already mine" because she was a non-felon.

Having reviewed the record, we conclude that this is not a case in which Campbell's constructive possession of the weapon is supported solely by the tenuous link of mere proximity. There exists other circumstantial evidence showing that he knowingly possessed the Colt pistol specified in the indictment. On the same evening of Campbell's arrest, Wright observed a person hand a gun to Campbell while he was sitting in the passenger side of her car. Campbell told her that someone shot at his car, allowing the inference that he obtained the gun for revenge or protection. Wright "thought" that Campbell took the gun back into the house, but was uncertain as to whether he actually did so.

After taking his daughter home, Campbell and Wright drove around and then parked under the viaduct. As the officers approached, Campbell remained slumped in his seat with his hands out of sight, as if avoiding detection or hiding a weapon. A rational trier of fact could conclude that he was concerned about the officers finding the pistol. Officer Quinn found the gun protruding from under the very seat where Campbell was sitting – and exactly the same seat where Campbell was sitting earlier when he was handed a gun at T-Mack's house. Wright testified unequivocally that the gun did not belong to her and that it was not in the car before she picked up Campbell. Additionally, on the day after his arrest, Campbell made an incriminating statement to Wright, telling her that she should have "take[n] the charge" and "[said] the gun was already mine" because she was a non-felon. A rational trier of fact could interpret this statement as an acknowledgment of guilt.

Thus, the fact that Wright could not positively identify the gun given to Campbell earlier on the day in question as the same gun found later in her car does not negate his conviction. In addition to the other reasonable inferences noted above that could be drawn from the evidence, a rational trier of fact could have concluded that Wright, being Campbell's friend, was reluctant to identify the gun at trial in order to help Campbell. As we noted in *Arnold*, "we cannot overturn the jury's decision merely because it had to draw reasonable inferences to find [the defendant] guilty." *Arnold*, 486 F.3d at 181. "[T]he critical point is that the jury could have drawn different inferences from [the government's] evidence, and our mandate is to affirm when the jury's choice was a rational one . . . ." *Id.* at 182.

Here, the jury's conclusion that Campbell constructively possessed the Colt pistol was drawn rationally from the evidence, and we therefore will not disturb the verdict.

IV.

Campbell next alleges that his trial counsel was ineffective in failing to argue to the jury that there was no fingerprint or other scientific evidence linking him to the firearm found in Wright's vehicle. However, as a general rule, we will not review claims of ineffective assistance of counsel for the first time on direct appeal unless the record is sufficiently developed. *United States v. Stuart*, 507 F.3d 391, 394 (6th Cir. 2007). We find no reason to deviate from the general rule in this case,

where the existing record does not allow for a thorough assessment of the merits of Campbell's claim.  Accordingly, we decline to address the issue, which is more appropriately raised through a post-conviction motion brought pursuant to 28 U.S.C. § 2255.  *Id.*

V.

Defendant's final appellate argument, raised in his pro se supplemental brief, that prosecutorial conduct requires reversal of his conviction, is without merit in the record.

VI.

For the reasons stated herein, we therefore affirm Campbell's conviction.