NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0556n.06

No. 10-5954

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*May 30, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| FRANCISCO MORALES ANGELES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: CLAY and GIBBONS, Circuit Judges, and KORMAN, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** In June 2007, defendant-appellant Francisco Morales Angeles abducted Jose Garcia and held Garcia captive in a motel room for nine days in order to extract money from him and his associates. A jury found Morales Angeles guilty of kidnapping, hostage-taking, carjacking, and using a firearm in the commission of a crime of violence. The district court subsequently sentenced Morales Angeles to a within-Guidelines term of life imprisonment. On appeal, Morales Angeles argues that the district court erred when it denied his motion for acquittal or a new trial, which was based on his claims that the kidnapping and hostage-taking convictions were muliplicitous and that the evidence at trial supported only one conviction under 18 U.S.C. § 924(c). Morales Angeles also asserts that the life sentence he received

_____

[*]The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

1

is substantively unreasonable and violates the Eighth Amendment's prohibition against cruel and unusual punishment. For the reasons that follow, we affirm the sentence imposed by the district court.

I.

This case arises out Morales Angeles's abduction of Jose Garcia. On June 13, 2007, after patrol officers responding to a 9-1-1 call from the West/Park Vista Inn in Knoxville, Tennessee requested assistance, Officer Heather Reyda of the major crimes division of the Knox County Sheriff's Department arrived to discover a frightened, disheveled man—later identified as Jose Garcia—who reported that he had been the victim of a carjacking, kidnapped, and held captive for nine days. He had escaped from a room on the back side of the motel and had ran to the motel office to call 9-1-1. Garcia, who was convinced that his captors were coming back to kill him, needed to be reassured repeatedly that he was no longer in danger. Garcia reported that during the time he was held captive, he had been tortured and forced to write checks to be cashed. He identified his captors as two men going by the names of "Juan Gonzalez"—later identified as an alias of defendant Morales Angeles—and "Paco"—later identified as an alias of defendant Jose Sanchez.

Garcia, who was a legal resident alien, operated a construction business in Knoxville, Tennessee. He first met the defendants, Morales Angeles and Sanchez, at his home when he was hosting a fish fry. They claimed to have recently come from Houston and to be looking for work. Garcia met with Morales Angeles and Sanchez a few days later, driving them to different job sites to give them an idea of the type of work they might potentially be hired to perform. On the day that he was abducted, Garcia met with Morales Angeles and Sanchez again to show them a project

2

outside of Knoxville in Lenoir City. Following the tour of the property and lunch, Sanchez remained with Garcia while Morales Angeles left to take care of other business. They agreed to meet up later to discuss the potential employment arrangement.

Morales Angeles rejoined the group later that day and got back into Garcia's vehicle. Morales Angeles eventually asked Garcia to stop near a Harley-Davidson dealership so that he could get out and go to use the bathroom. But when Garcia stopped the car, Sanchez, who was sitting in the back seat, took out a knife and held it to Garcia's throat while Morales Angeles took out a pistol and used it to repeatedly strike Garcia in the face and head. Morales Angeles also threatened to kill Garcia and told him three or four times that they had come to kill him. Morales Angeles and Sanchez then bound Garcia's hands, drove the vehicle into a wooded area, and forced Garcia to write a check made out to "Juan Gonzalez" in the amount of $400. Morales Angeles left in Garcia's vehicle to cash the check, leaving Garcia and Sanchez in the wooded area. He returned about two hours later in his own vehicle, a Lincoln Navigator.

Garcia was then put into the Navigator, a blanket was placed over his head, and he was driven around in an attempt to disorient him before he was taken to the motel room from which he eventually escaped. There, Garcia was put between the two beds and bound with his shoelaces and torn strips of bed sheets. Morales Angeles and Sanchez kept a two-by-four piece of lumber in the room with which they threatened to break Garcia's legs. Sanchez also heated up the blade of his knife and used it to burn Garcia's arm. Morales Angeles appeared to be in charge as he would give orders to Sanchez and come and go as he pleased, leaving Sanchez in the room to guard Garcia.

Morales Angeles told Garcia that he was part of the Zetas, which was an organization with a reputation for drug trafficking and kidnapping with political ties in Mexico. Garcia was also forced to speak with a person over the telephone referred to as "El Comandante," who seemed to be Morales Angeles's superior. El Comandante falsely claimed that Garcia owed him $200,000 and threatened to break Garcia's legs or kill Garcia if Garcia did not pay him.

While in the motel room, Morales Angeles forced Garcia to sign additional checks from Garcia's business accounts, ultimately emptying them. Garcia was also forced to call at least three other friends and business associates in order to get money from them as well. Additionally, after listening in on a conversation between Garcia and his brother, Morales Angeles tried to force Garcia to have his brother sell a piece of family-owned property in Mexico for $100,000 and deliver the proceeds to his associates in Mexico. Fearing for the safety of his brother and other family in Mexico, Garcia refused to cooperate with this demand and, instead, decided to attempt to escape. After nine days in captivity, Garcia managed to escape one night when Sanchez was asleep.

After Garcia escaped, Morales Angeles and Sanchez traveled to Houston where they were later arrested. On October 16, 2007, a federal grand jury charged Morales Angeles and Sanchez in a nine-count superseding indictment relating to the carjacking and abduction of Garcia. Morales Angeles was charged with: (1) conspiring to kidnap Garcia and hold him for ransom while using instrumentalities of interstate commerce in violation of 18 U.S.C. § 1201(c) (Count One); (2) kidnapping Garcia and holding him for ransom while using instrumentalities of interstate commerce in violation of 18 U.S.C. § 1201(a)(1) and (2) (Count Two); (3) using a firearm during and in relation to the crimes of violence charged in Counts One and Two in violation of 18 U.S.C. § 924(c) (Count

Three); (4) taking Garcia's vehicle by force, violence, and intimidation (*i.e.*, carjacking) in violation of 18 U.S.C. § 2119 (Count Four); (5) using a firearm during and in relation to the crime of violence charged in Count Four in violation of 18 U.S.C. § 924(c) (Count Five); (6) detaining and threatening to kill Garcia, a non-citizen, in order to compel a third person to pay money for his release (*i.e.*, hostage-taking) in violation of 18 U.S.C. §1203(a) and (b)(2) (Count Six); (7) conspiring to take Garcia hostage in violation of 18 U.S.C. § 1203(a) and (b)(2) (Count Seven); (8) using a firearm during and in relation to the crimes of violence charged in Counts Six and Seven in violation of 18 U.S.C. § 924(c) (Count Eight); and (9) illegally re-entering the United States in violation of 8 U.S.C. § 1326(a) (Count Nine).

On the morning of the first day of the trial, Sanchez pled guilty to most of the charges against him and agreed to cooperate with the government. At the close of the government's case, Morales Angeles moved for acquittal pursuant to Federal Rule of Criminal Procedure 29 on Counts Three, Five, and Eight, arguing that because a gun was only used at one point during the crime, there was only one possible violation of § 924(c), and on Counts Six and Seven, arguing that the hostage-taking charges and the kidnapping charges were multiplicitous. The district court denied the motion. The jury subsequently convicted Morales Angeles on all counts in the superseding indictment except for Count Eight.

Newly appointed counsel for Morales Angeles then filed an amended motion for judgment of acquittal, or, alternatively, a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, repectively, asserting that the district court erred by failing to suppress statements made by Morales

Angeles and by denying the earlier Rule 29 motion for acquittal. The district court denied this motion as well.

A presentence investigation report ("PSR") was prepared prior to sentencing. It indicated a total offense level of 43 and zero criminal history points, placing Morales Angeles in a criminal history category of I. This resulted in an advisory Guidelines range of life imprisonment, along with statutorily mandated consecutive sentences of 84 months and 300 months for the firearms offenses.

At the sentencing hearing, Morales Angeles did not object to the calculation of his advisory Guidelines range or other aspects of the PSR but instead argued for a downward variance based on a number of 18 U.S.C. § 3553(a) sentencing considerations. The government argued that a life sentence was appropriate given Morales Angeles's history and conduct in this case and presented two witnesses in support of its position, Sanchez and FBI Agent David Bukowski.

Sanchez testified that he worked with Morales Angeles to pay off a debt that he owed to a group called the Zetas for their assistance in transporting him to the United States. Sanchez agreed to this arrangement because he believed "Zetas kill people and torture people that don't pay them their money." Sanchez stated that, in addition to selling drugs and driving for Morales Angeles, the pair carried out other abductions similar to the kidnapping of Garcia. He described an incident in Tulsa, Oklahoma, where they abducted the owner (and an employee) of a car dealership, who allegedly owed Morales Angeles's boss $60,000. Sanchez also described the violent abductions of two individuals in Houston, Texas, who had failed to pay the fee imposed by the Zetas for transporting people over the Mexico-United States border, that he and Morales Angeles orchestrated.

6

FBI Agent Bukowski testified that the victim of the Tulsa abduction, Jorge Figueroa, had been interviewed by the FBI and that Figueroa had identified Morales Angeles and Sanchez as his captors.

Morales Angeles argued through counsel that the recommended Guidelines range of life imprisonment overstated the seriousness of his crimes. Defense counsel pointed out that the base offense level for second-degree murder was lower than the total base offense level calculated for Morales Angeles for the crimes charged in this case. He also argued that because Morales Angeles would likely be very old at the end of any sentence imposed and is to be deported after serving his sentence, the risk that he would re-enter the United States and commit similar crimes in the future was very low, making a life sentence unnecessary.

After hearing from the parties, the district court made its sentencing determination. Addressing the 18 U.S.C. § 3553(a) sentencing factors, the district court noted the severe victim impact of Morales Angeles's offense, the history and characteristics of Morales Angeles, the serious nature of the offense, the need to afford adequate specific and general deterrence, and the need to protect the public. The district court found Morales Angeles's comparison of his total offense level to the second-degree murder base offense level unhelpful and irrelevant when divorced from the circumstances of a particular case. It also found that Morales Angeles's argument that he would be very old and then deported by the time he left prison, if he were ever to do so, to be insufficient to warrant a variance from the Guidelines range. Finally, the district court rejected Morales Angeles's argument that a sentence of life imprisonment, coupled with the two mandatory minimum consecutive sentences, would constitute cruel and unusual punishment under the Eighth Amendment.

The district court sentenced Morales Angeles to a term of life imprisonment for Counts One, Two, Six, and Seven, to run concurrently with a term of 180 months for Count Four and 24 months for Count Nine, followed by consecutive terms of 84 months' imprisonment on Count Three and 300 months' imprisonment on Count Five.

II.

On appeal, Morales Angeles first argues that the district court committed legal error when it denied his motion for judgment of acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, in which he asserted that the kidnapping and hostage-taking charges were mulitplicitous and that the evidence presented at trial supported only one conviction under 18 U.S.C. § 924(c). Generally, this court reviews the denial of a Rule 29 motion for acquittal *de novo*. *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). When conducting this review, we "examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. Denial of a Rule 33 motion for a new trial is reviewed for abuse of discretion. *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). Abuse of discretion occurs when a district court "relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.* (quoting *United States v. Washington*, 584 F.3d 693, 695 (6th Cir. 2009)). Finally, the denial of Morales Angeles's motion for acquittal or a new trial raised questions of law—*i.e.*, whether his charges were multiplicitous and whether the district court properly applied 18 U.S.C. § 924(c)—which this court reviews *de novo*. *See United States v. Swafford*, 512 F.3d 833, 844 (6th

Cir. 2008) (multiplicitous indictment); *United States v. Langan*, 263 F.3d 613, 626–27 (6th Cir.

2001) (application of 18 U.S.C. § 924(c)).

A.

Multiplicity, which is the charging of a single offense in more than one count in an

indictment, "may result in a defendant being punished twice for the same crime or may unfairly

suggest that more than one crime has been committed." *Swafford*, 512 F.3d at 844 (internal citation

omitted). "To determine if multiplicity exists, a court must first look to 'whether Congress intended

to punish each statutory violation separately.'" *Id*. (quoting *Pandelli v. United States*, 635 F.2d 533,

536 (6th Cir. 1980)). When congressional intent is unclear, a court then applies the general test for

compliance with the Double Jeopardy Clause, which asks "whether each provision requires proof

of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). "Using

the same evidence to prove violations of two statutes does not violate *Blockburger*." *Swafford*, 512

F.3d at 844. When applying the *Blockburger* test, a reviewing court must "look to the legal theory

of the case or the elements of the specific criminal cause of action for which the defendant was

convicted without examining the facts in detail." *Pandelli*, 635 F.2d at 538.

The federal kidnapping statute, 18 U.S.C. § 1201, provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or
carries away and holds for ransom or reward or otherwise any person, except in the
case of a minor by the parent thereof, when--

(1) the person is willfully transported in interstate or foreign commerce,
regardless of whether the person was alive when transported across a State
boundary, or the offender travels in interstate or foreign commerce or uses the
mail or any means, facility, or instrumentality of interstate or foreign
commerce in committing or in furtherance of the commission of the offense
. . .

9

commits the crime of kidnapping.  18 U.S.C. § 1201(a).  And the federal hostage-taking statute, 18

U.S.C. § 1203, provides:

> (a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.
> . . .
> (b)(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203(a) and (b)(2).  While it is reasonably clear that Congress adopted the Hostage

Taking Act "to extend jurisdiction over extraterritorial crimes and satisfy the country's obligations

as a party to various international conventions," *United States v. Yunis*, 681 F. Supp. 896, 904

(D.D.C. 1988); *see also United States v. Ferreira*, 275 F.3d 1020, 1027 (11th Cir. 2001) ("Congress

passed the Hostage Taking Act to implement the International Convention Against the Taking of

Hostages."), it is not clear whether Congress intended to punish violations of the hostage-taking

statute separately from violations of federal kidnapping statute.  Accordingly, we turn to the general

test to determine whether conviction under both statutes violates the Double Jeopardy Clause.

Although the statutes are very similar—using similar language and punishing similar

conduct—they are not identical.  Each statute requires proof of a fact that the other does not.  *See*

*United States v. Carrion-Caliz*, 944 F.2d 220, 224 (5th Cir. 1991) (finding that the two statutes are

not redundant because they carry different jurisdictional requirements).  To prove the kidnapping

charge in this case, the government was required to establish that Morales Angeles traveled in or used an instrumentality of interstate commerce in the commission of the offense, which was not required in proving the hostage-taking charge. To prove the hostage-taking charge, the government was required to establish that either Morales Angeles or Garcia was not a United States citizen, since the conduct occurred inside the United States, and that a third party was compelled to do or abstain from doing an act as a condition of Garcia's release. These facts were not required to prove the kidnapping charge. Because the kidnapping charges and the hostage-taking charges each required proof of at least one element not required by the other, they were not multiplicitous, and conviction under both statutes did not violate the Double Jeopardy Clause.[1] The district court did not err in denying Morales Angeles's motion for acquittal or a new trial made on the grounds that the kidnapping counts and hostage-taking counts were multiplicitous.

---

[1]The Fifth Circuit has held that two statutes constitute the same offense under the Double Jeopardy Clause where the sole difference between the two statutes is a jurisdictional element. *See United States v. Gibson*, 820 F.2d 692, 698 (5th Cir. 1987). At least one other circuit, however, has expressly rejected this approach. *See United States v. Hairston*, 64 F.3d 491, 496 (9th Cir. 1995) (rejecting *Gibson* because it "ignores the fact that Congress may have strong interests in treating crimes occurring within the jurisdiction of the United States differently from those occurring elsewhere" and giving the jurisdictional element of a statute substantive weight in the *Blockburger* analysis); *see also United States v. Agofsky*, 458 F.3d 369, 372 (5th Cir. 2006) (expressing "some concern with the reasoning of *Gibson*" but recognizing that it must follow this binding Fifth Circuit precedent). While this court has not clearly adopted either position, we read *Pandelli* to treat jurisdictional elements as deserving weight in the *Blockburger* analysis. *See Pandelli*, 635 F.2d at 539 (stating that when performing a double jeopardy analysis, a court must eliminate the *inapplicable* alternative jurisdictional provisions, which implies that the *applicable* jurisdictional provisions should factor into the analysis).

11

B.

Morales Angeles also argues that he was improperly convicted of multiple counts of using a firearm in connection with a crime of violence under 18 U.S.C. § 924(c) and that the district court should have granted his motion for acquittal or a new trial for this reason. Morales Angeles asserts that the testimony at trial established that he only used or displayed a gun on one occasion—when he initially abducted Garcia—and therefore only one, not both, of his convictions under 18 U.S.C. § 924(c) on Counts Three and Five can stand. The district court properly rejected this argument.

It is well-settled that "a court may not impose more than one sentence upon a defendant for violations of section 924(c) which relate to but one predicate offense." *United States v. Sims*, 975 F.2d 1225, 1233 (6th Cir. 1992). However, "[w]e have upheld multiple convictions and sentences under 18 U.S.C. § 924(c)(1) so long as such convictions are based on separate predicate acts." *United States v. Graham*, 275 F.3d 490, 519–20 (6th Cir. 2001); *see also United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999) ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode [is] lawful."). The question we must answer then is whether Count Three—use of a firearm in relation to the kidnapping of Garcia—relies on a separate predicate act from Count Five—use of a firearm in relation to the carjacking.

It is clear that when predicate offenses consist of non-identical conduct and are not committed simultaneously, these offenses are separate predicate acts that can support multiple convictions under 18 U.S.C. § 924(c). *Compare Graham*, 275 F.3d at 520–21 (finding that a drug trafficking offense and a conspiracy to commit crimes against the United States were separate

predicate acts since they "were not committed simultaneously, nor did they consist of identical conduct") *and Burnette*, 170 F.3d at 572 (upholding two convictions under § 924(c) where "the kidnapping occurred significantly before, and independent of, the actual bank robbery") *with United States v. Johnson*, 25 F.3d 1335, 1338 (6th Cir. 1994) (*en banc*) ("[P]ossession of one or more firearms in conjunction with predicate offenses involving simultaneous possession of different controlled substances should constitute only one offense under § 924(c)(1)."). Further, while a temporal gap between predicate offenses may bolster a showing that predicate acts are separate, predicate offenses need not occur at different times in order to support multiple § 924(c) convictions. *See United States v. Nabors*, 901 F.2d 1351, 1353, 1358–59 (6th Cir. 1990) (finding that the predicate offenses of drug trafficking and a crime of violence—either attempted murder of a federal agent or assaulting a federal agent with a deadly weapon—supported two separate § 924(c) convictions, even though the drug trafficking occurred simultaneously, at least in part, with the crime of violence). Rather, the fact that each offense requires proof of facts not required by the other offense appears to be sufficient to show that the predicate acts are separate. *Id*. at 1358.

In this case, the predicate offenses of kidnapping, which requires proof of the unlawful abduction and holding of a person, and carjacking, which requires proof of the taking of a motor vehicle from a person by force and violence or intimidation, clearly involve different conduct and thus are separate predicate acts. *See* 18 U.S.C. §§ 1201 & 2119. Accordingly, because Counts Three and Five are based on separate underlying predicate acts, Morales Angeles's conviction on both counts does not violate the Double Jeopardy Clause. The district court did not err in denying Morales Angeles's motion for judgment of acquittal or a new trial made on these grounds.

III.

Morales Angeles also challenges the substantive reasonableness of his sentence, arguing that

a term of life imprisonment was not warranted under the circumstances of his case. "Post-*Booker*,

we review a district court's sentencing determination under a deferential abuse-of-discretion

standard, for reasonableness." *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008) (internal

quotation marks omitted). Review of the substantive reasonableness of a sentence takes into account

the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence may be

substantively unreasonable, for instance, if the district court selects it arbitrarily, bases it on

impermissible factors, fails to consider pertinent Section 3553(a) factors, or gives an unreasonable

amount of weight to any pertinent factor. *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005).

When a sentence falls within the Guidelines range, a presumption of reasonableness applies. *United

States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (*en banc*). "The fact that the appellate court

might reasonably have concluded that a different sentence was appropriate is insufficient to justify

reversal of the district court." *Gall*, 552 U.S. at 51.

Morales Angeles claims that his sentence is substantively unreasonable because his conduct

was not the "type of heinous and atrocious behavior that would merit life imprisonment." He argues,

as he did at his sentencing hearing, that if he had he killed Garcia instead of abducting him, he would

potentially be eligible for sentencing for second-degree murder with a base offense level of 38

instead of the total offense level of 43 that was applicable here. The district court considered and

properly rejected this argument, stating that a comparison to this hypothetical scenario was unhelpful

because the second-degree murder offense level of 38 would just be a base offense level and the

other circumstances of the crime would determine what enhancements, if any, would be applied.

The district court also pointed out that this scenario presumes that Morales Angeles would qualify

for second-degree murder when the actual circumstances of this case—Morales Angeles subjecting

Garcia to a multiple-day period of physical and mental abuse—make it less plausible that Morales

Angeles would have met the "heat of passion" limitation for second-degree murder. The district

court did not abuse its discretion by choosing not to credit this argument.

Neither did district court abuse its discretion when it rejected Morales Angeles's argument,

also raised again on appeal, that a lesser sentence was warranted because he would be an extremely

old man by the time he would exit prison and would then be deported to Mexico if he were sentenced

to less than life imprisonment. The district court chose not to give this argument significant weight

primarily because Morales Angeles had a history of entering the United States illegally, and the court

found it was not unreasonable to assume that he would seek to re-enter the country again and perhaps

undertake similar crimes.

Instead, after carefully considering all § 3553(a) sentencing factors, the district court

concluded that a within-Guidelines sentence of life imprisonment was appropriate in this case. The

court noted that Garcia endured mental and physical torture over a nine-day period and that this was

likely not the first time Morales Angeles had engaged in this type of conduct. The seriousness of the

crime, the need for adequate deterrence, the need to protect the public, and the characteristics of the

defendant all point to the reasonableness of the sentence imposed.

Moreover, because the sentence is within the recommended range under the Guidelines, it

is entitled to a presumption of reasonableness. *See Vonner*, 516 F.3d at 389. Morales Angeles has

failed to rebut this presumption. *See United States v. Robinson*, 503 F.3d 522, 528 (6th Cir. 2007) (finding that it is incumbent upon the defendant to establish that his within-Guidelines sentence was unreasonable); *United States v. Trejo-Martinez*, 481 F.3d 409, 413 (6th Cir. 2007) ("The mere fact that [the defendant] desired a more lenient sentence, without more, is insufficient to justify our disturbing the reasoned judgment of the district court."). We find that his sentence was substantively reasonable.

IV.

Finally, Morales Angeles argues that his life sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. A constitutional challenge to a sentence is reviewed *de novo*. *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009). When a defendant challenges a sentence on Eighth Amendment grounds, this Court applies a "narrow proportionality principle" that prohibits "only extreme sentences that are grossly disproportionate to the crime" and "does not require strict proportionality between crime and sentence." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring) (internal quotation marks omitted); *Jones*, 569 F.3d at 573.

Given the seriousness of the crime, Morales Angeles's history and characteristics, and the other circumstances of this case, we find that a life sentence is not grossly disproportionate to the crime. His sentence is not "extreme," as the Sentencing Commission has concluded that a life sentence is reasonable for the crimes committed in this case, and other courts have upheld life sentences for kidnapping against Eighth Amendment challenges. *See, e.g., Eckert v. Tansy*, 936 F.2d 444, 447–49 (9th Cir. 1991) (holding that the imposition of two consecutive life sentences for first-

degree kidnapping was not excessively harsh relative to the gravity of the crimes of which the defendant was convicted and therefore did not constitute cruel and unusual punishment). Morales Angeles offers no examples of decisions where a court has struck down, on Eighth Amendment grounds, a life sentence imposed for crimes similar to those for which he has been convicted. His bare assertion that his life sentence constitutes cruel and unusual punishment is insufficient to establish a constitutional violation. Because a "threshold comparison" of the gravity of Morales Angeles offense and the severity of his sentence does not reveal an inference of gross disproportionality, we conclude that there was no Eighth Amendment violation. *See Harmelin*, 501 U.S. at 1005 (Kennedy, J., concurring).

V.

For the reasons provided above, we affirm the district court's judgment. Morales Angeles has failed to establish that the district court erred when it denied his motion for judgment of acquittal or new trial, and he has not shown that his sentence was substantively unreasonable or in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.