JULIA SMITH GIBBONS,
Circuit Judge, dissenting.
I respectfully but emphatically disagree with the majority’s conclusion that LaPag-lia was a “state actor” for Fourth Amend *549 ment purposes. In its ruling, the majority draws factual inferences not permitted by this record and imposes a duty on law enforcement officers to interfere with the work of physicians that is not in accord with reality, good judgment, or the law. Because I would decide the “state actor” issue differently, I would not reach the question of whether the “search” LaPaglia performed was reasonable. I therefore dissent.
I.
The majority opinion hinges on the premise that “the police knew what La-Paglia was going to do” when they decided to take Booker to the Methodist Medical Center (“Methodist”). (Maj. Op. at ¶ 27.) It argues that “[t]his case is the unusual one in which the police effectively use a doctor who is known to conduct unconsent-ed intrusive procedures when suspects in custody are presented by the police.” (Id. at ¶ 60.) The only record evidence asserted in support of this claim is LaPaglia’s testimony that the Anderson County Sheriff’s Department had sought LaPaglia’s assistance in removing foreign objects from individuals in its custody on three occasions in the three years prior to his testimony at the suppression hearing. (Id. at ¶ 9; see also R. 32, Suppression Hr’g Tr., at # 245.)
The majority leaps from this testimony to unwarranted inferences about its import. First, and most importantly, LaPag-lia’s testimony is no evidence at all with respect to the officers in this case. There is no indication that the officers involved in Booker’s arrest and search had any knowledge of these prior incidents, and the conduct or knowledge of different deputies on different occasions cannot be imputed to them. Indeed, there is no evidence that any of the officers involved in this case had even met LaPaglia before the incident. The first known interaction between La-Paglia and any of the officers involved in this case came when Steakley arrived at the hospital and told LaPaglia about Booker’s impending arrival. Moreover, LaPag-lia’s admission is ambiguous as to whether it refers to the removal of objects from rectal cavities generally, or to the particular tactics he used to remove the crack cocaine from Booker’s rectum. The statement also sheds no light on whether La-Paglia was able to obtain consent before performing an anal cavity search on these three prior occasions. Booker did not develop a record in the district court about the officers’ awareness of LaPaglia’s previous interactions with the Sheriff’s Department or LaPaglia’s conduct on these previous occasions. The majority can only reach its conclusion about what the officers knew in this case by making numerous assumptions that lack support in the record. These assumptions are especially problematic on appeal because of our obligation to review the record in the light most favorable to the party that prevailed below — in this case, the government. United States v. Campbell, 549 F.3d 364, 370 (6th Cir.2008).
Furthermore, the record amply supports the district court’s conclusion that the officers believed Booker had a serious medical issue requiring the attention of a physician. Shelton testified that after Booker’s strip search all but confirmed he had a foreign object in his rectum, he “figured it was a medical situation” and reported the matter to his supervisor at the county jail. (R. 32, Suppression Hr’g Tr., at #211.) His supervisor told him to “take the defendant right to the hospital for his safety.” (Id. at # 212.) Ridenour also testified that the jail supervisor instructed them to “transport[] [Booker] to Methodist Medical Center” after the strip search. (Id. at # 188.) There is no testimony supporting *550 the idea that the officers intended to retain LaPaglia specifically or a doctor with similarly low ethical standards generally for the sole purpose of conducting an unlawful evidentiary search. It is also difficult to understand how the officers could have harbored such an intent. There is no evidence in the record suggesting that the officers knew that LaPaglia was a physician at this hospital, that he would be on duty at the precise time they concluded Booker was in need of medical attention, or that doctors at Methodist’s emergency room had a history of assisting law enforcement in unlawful searches. Finally, all observers of this incident agreed that LaPaglia, not the officers, made the decision to pursue the anal cavity sweep to the point of intubating and paralyzing Booker. While the officers explained Booker’s situation to LaPaglia, they did not attempt to dictate his treatment methods. A district judge ruling on this question in the first instance may have been able to infer a tacit agreement between the officers and LaPaglia, but that is not a conclusion a panel of this court may draw when reviewing an order denying a motion to suppress.
I agree with the majority that law enforcement officers may not present a criminal suspect to a doctor who, like the “local town thug,” (Maj. Op. at ¶ 26), they know with some certainty will perform acts on the defendant the police could not perform themselves without violating the Fourth Amendment. But the record, read with the proper standard of review in mind, does not support this view of the case. The district court reasonably found that the officers took Booker to the emergency room because they believed he had a serious health problem. There is no evidence that the officers had met LaPaglia prior to this incident, knew he would be at the emergency room they took Booker to at that particular time of day, or knew that he had previously worked with the Sheriffs Department. In the absence of a record establishing these facts, the premise that LaPaglia was a mere “tool” of the officers is unsupportable.
II.
I also take issue with the majority’s conclusion that because a reasonable officer “would know that [LaPaglia] did not, independently of police direction, have the legal authority to intubate and paralyze the suspect without his consent,” LaPaglia’s actions should be imputed to the officers. (Maj. Op. at ¶ 27.) The unlawfulness of LaPaglia’s actions standing alone is not relevant to analyzing whether or not he was a state actor. The state action doctrine “turns on the degree of the Government’s participation in the private party’s activities,” not the nature of those activities. Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 614-15, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Nonetheless, as the majority argues, when a private individual engages in patently unlawful conduct in the presence of law enforcement and reasonable officers would understand they had a duty to stop that conduct, that person should be deemed a “state actor” for Fourth Amendment purposes. The majority’s analogy to the village “thug” is again instructive. If the police handed a suspect over to such a person, and that person began to “batter[ ] the subject in a way that the police clearly could not,” the officers would be responsible for allowing that beating to happen, even if they were not aware of the thug’s intentions from the outset. (Maj. Op. at ¶ 26.)
But the majority’s analogy does not decide this case. Doctors are not thugs; they are legally licensed professionals trained to handle sensitive medical matters. Law enforcement officers rightly defer to their judgment in their area of ex *551 pertise. Unfortunately, there are doctors who will abuse that trust, which is precisely what happened in this case. LaPaglia told the officers that Booker was in a life-threatening situation and that if LaPaglia did not perform an anal cavity sweep, Booker’s life was at risk. He also told them that because this issue was potentially fatal, he had an obligation as a physician to remove the foreign object lodged in Booker’s rectum even if Booker refused consent to the procedure. A reasonable officer, untrained in medicine or medical ethics, is not in a position to second-guess these assertions and should not be disciplined for failing to do so through the suppression of evidence.
The majority argues that LaPaglia created a false dilemma for the officers, that he had no legal right to do what he did to Booker without Booker’s consent, and that less intrusive measures for obtaining evidence were available to the officers. I agree with all of these points, but I do not believe that they resolve this case. The issue here is not whether a more reasonable option for obtaining evidence that did not offend Booker’s personal autonomy was available in the abstract, but whether the officers are responsible for LaPaglia’s conduct solely because they accepted his assessment of the situation. The district court correctly answered this question in the negative. A doctor should not be considered the agent of law enforcement officers who fail to intervene in his treatment of a prisoner absent evidence that the officers understood the doctor’s representations and actions were made in bad faith. No such evidence exists in this case. I therefore cannot accept the majority’s conclusion that the officers should share in LaPaglia’s culpability for the manner in which he conducted the medical examination.
III.
The majority’s position reflects its concern that failure to suppress evidence in cases like these will “eviscerate fundamental Fourth Amendment protections.” (Maj. Op. at ¶ 26.) That concern is a weighty one. I agree with the majority that when a defendant can demonstrate law enforcement officers used a physician as a mere instrument for performing searches they could not perform themselves, it is appropriate to suppress evidence the physician recovers. But the suppression remedy does not exist to punish unlawful conduct generally. It is meant to deter misconduct by law enforcement that is “sufficiently culpable that such deterrence is worth the price paid by the justice system.” Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). By punishing the officers in this case for a physician’s misconduct merely because the officers deferred to a doctor’s representatipns about a medical issue, the majority takes the exclusionary rule far beyond its permissible bounds.
Such an expansion is particularly unnecessary in this case because doctors already face substantial legal deterrents for engaging in conduct that would violate the Fourth Amendment if undertaken by state officers. For instance, a doctor may face civil liability under a medical battery theory if a physician performs a procedure on a patient against his will. See Blanchard v. Kellum, 975 S.W.2d 522, 524 (Tenn.1998) (“Performance of an unauthorized procedure constitutes a medical battery.”). A doctor could also face disciplinary action from the Tennessee Board of Medical Examiners for engaging in such conduct. See Tenn.Code Ann.63-6-214(b)(4) (granting the Board authority to discipline a physician on the grounds of “[gjross health care liability or a pattern of continued or re *552 peated health care liability, ignorance, negligence or incompetence in the course of medical practice”). New doctors will be willing to countenance such risks in order to help the police obtain evidence, and broad application of the exclusionary rule is unnecessary to dissuade them from performing unlawful searches.
IV.
For these reasons, I would conclude that LaPaglia was not a “state actor” under the Fourth Amendment. I would therefore affirm the judgment of the district court. I respectfully dissent from the majority’s contrary holding.